**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FREEDOM FROM RELIGION FOUNDATION, INC., DOE 1** *by DOE 1's next friend and parent,* *MARIE SCHAUB,* **MARIE SCHAUB** *who also sues on her own behalf,* **DOE 2** *by Doe 2's next friend and parent DOE and* **DOE 3** *who also sues on Doe 3's own behalf*<br><br>**Plaintiffs,**<br><br>**v**<br><br>**NEW KENSINGTON-ARNOLD SCHOOL DISTRICT,**<br><br>**Defendant.** | )<br>)<br>)<br>)  **2:12-cv-1319**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER OF COURT

Presently pending before the Court is the MOTION TO DISMISS AND MOTION TO STRIKE PURSUANT TO FEDERAL RULES 12(B)(6) AND 12(F) (Doc. No. 8), filed by Defendant New Kensington-Arnold School District, with brief in support (Doc. No. 9). Plaintiffs, Freedom from Religion Foundation, Inc., Doe 1, by Doe 1's Next of Friend and Parent Marie Schaub, who also sues on her own behalf, Doe 2, by Doe 2's Next of Friend and Parent Doe 3, who also sues on Doe's own behalf filed a response in opposition (Doc. No. 18)

As an initial matter, the Court will deny the Motion to Strike paragraph twenty-one (21), a portion of paragraph twenty-two (22), and paragraph twenty-three (23) of the Complaint. The statements contained therein do not fall within the realm of this highly disfavored remedy. *See* Fed. R. Civ. P. 12(f) (providing that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"). Indeed, "striking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice and should be used sparingly." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (internal

quotation marks and citation omitted).   The Court finds that Defendant has not made this showing, and therefore, the Court exercises its discretion to deny that request.   Accordingly, the Court turns to Defendant's Motion to Dismiss.

## I.   Background

For decades, the New Kensington-Arnold School District has maintained a stone monument bearing numerous inscriptions.   Standing approximately six feet tall at the front entrance to Valley High School, a portion of the monument displays the text of the Ten Commandments.   *See* Pls.' Compl. Exs. 1-2, ECF Nos. 1-2, 1-3 (appending two photographs of the monument).   The version inscribed reads:

the Ten Commandments
I AM the LORD thy God.

|       |                                                                                                                      |
| ----- | -------------------------------------------------------------------------------------------------------------------- |
| I.    | Thou shalt have no other gods before me.                                                                             |
| II.   | Thou shalt not take the Name of the Lord thy God in vain.                                                            |
| III.  | Remember the Sabbath Day, to keep it holy.                                                                           |
| IV.   | Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.         |
| V.    | Thou shalt not kill.                                                                                                 |
| VI.   | Thou shalt not commit adultery.                                                                                      |
| VII.  | Thou shalt not steal.                                                                                                |
| VIII. | Thou shalt not bear false witness against thy neighbor.                                                              |
| IX.   | Thou shalt not covet thy neighbor's house.                                                                           |
| X.    | Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's. |

Pls.' Compl. at 4, ECF No. 1.   Carved directly above the text are two tablets inlayed with that which appears to be ancient script and surrounded by a floral motif, an eye inside of a pyramid similar to that appearing on the back of a dollar bill, and an eagle grasping the American flag. Below the text of the Decalogue are the superimposed Greek letters Chi and Rho, two Stars of David, and an inscription indicating that a local chapter of the Fraternal Order of Eagles, a national civic organization, donated the monolith.   Aside from the shrubbery that appears to adorn the surrounding area, the monument stands alone.

Although unchallenged for many years, the presentation of the monument on the public school's grounds now faces a constitutional challenge.  On September 14, 2012, Plaintiffs initiated this action by the filing of a one-count Complaint in which they seek a declaration that the display of the Ten Commandments at Valley High School is unconstitutional and request an injunction directing the School District to remove it from the property.  The named Plaintiffs include the Freedom From Religion Foundation ("FFRF"), a national group that "works to defend the constitutional principle of separation between state and church, as well as to educate the public about the views of non-theists"; Marie Schaub, the mother and guardian of Doe 1, a resident taxpayer of the District, and a member of the FFRF; Doe 1, a student of Valley Middle School who will soon attend Valley High School and regularly frequents the latter while attending indoor sporting events; Doe 2, a student at Valley High School; and Doe 3, the parent and guardian of Doe 2 and a resident taxpayer in the District.  *See* Pls.' Compl. at 2, ECF No. 1.

Defendant challenges the legal sufficiency of the allegations in the Compliant, arguing that the Supreme Court of the United States' fairly recent Establishment Clause jurisprudence forecloses the cause advanced by Plaintiffs.  Defendant also argues that Plaintiffs have pleaded only formulaic recitals and conclusory statements that cannot withstand its Motion.

To the Plaintiffs, the School District misconstrues Supreme Court precedent and improperly injects facts beyond the Complaint in order to establish an ample factual background that would accommodate Defendant's guidance of the Court through a final analysis of their claim.  Plaintiffs argue that judicial notice of Defendant's proposed facts is not proper at this stage of the proceedings.

The parties have fully briefed these issues, and the Motion is ripe for disposition.

## II.  Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint, which may be dismissed for the "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6)  When reviewing a motion to dismiss, the Court must accept all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1861 (2012) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)).  However, as the Supreme Court of the United States made clear in *Bell Atlantic Corp. v. Twombly*, such "[f]actual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. 554, 555 (2007).

The Supreme Court later refined this approach in *Ashcroft v. Iqbal*, emphasizing the requirement that a complaint must state a plausible claim for relief in order to survive a motion to dismiss.  556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 555).  Nevertheless, "the plausibility standard is not akin to a 'probability requirement,'" but requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 555).

To determine the legal sufficiency of a complaint after *Twombly* and *Iqbal,* the United States Court of Appeals for the Third Circuit instructs that a district court must take a three step approach when presented with a motion to dismiss for failure to state a claim.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010) (noting that although *Iqbal* describes the process as a "two-pronged approach," it views the case as outlining three steps) (citing *Iqbal*,

556 U.S. at 675).   First, "the court must "tak[e] note of the elements a plaintiff must plead to state a claim."" *Id.* at 130 (quoting *Iqbal*, 556 U.S. at 675) (alteration in original).   Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).   Third, "'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Accordingly, the Court must separate the factual and legal elements of the claim and "accept the factual allegations contained in the Complaint as true, but [ ] disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-57; *Burch*, 662 F.3d at 220-21).   The Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'   In other words, a complaint must do more than allege the plaintiff's entitlement to relief.   A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Iqbal* 556 U.S. at 678).   The determination for "plausibility" will be "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).

However, nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion to dismiss pursuant to Rule 12(b)(6) and the requirements of Rule 8 must still be met.   *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal citations omitted).   The Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff

can prove those facts or will ultimately prevail on those merits." *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 553). Rule 8 also still requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 677-78 (citing Fed. R. Civ. P. 8(a)(2)). While this standard "does not require 'detailed factual allegations,' [ ] it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 544-55). Simply put, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

### III. Discussion

#### A.  The Establishment Clause

The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. 1. Generally speaking, this provision was "'designed as a specific bulwark against [the] potential abuses of governmental power.'" *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 269 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1097 (2012) (quoting *Flast v. Cohen*, 392 U.S. 83, 104 (1968)) (alteration in original). Among its prohibitions, the Establishment Clause forbids the government from "'promot[ing] or affiliat[ing] itself with any religious doctrine or organization'" or "'discriminat[ing] among persons on the basis of their religious beliefs and practices.'" *Id.* (quoting *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 590-91 (1989)) (alterations in original). These limitations "'appl[y] equally to the states, including public school systems, through the Fourteenth Amendment.'" *Id.*

(quoting *Borden v. Sch. Dist. of Twp. E. Brunswick*, 523 F.3d 153, 175 (3d Cir. 2008)) (citation omitted).

Indeed, modern Establishment Clause jurisprudence emerged roughly a half-century ago when the Supreme Court incorporated the Clause as against the states. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 839 (1995) ("The first case in our modern Establishment Clause jurisprudence was *Everson v. Bd. of Educ. of Ewing,* 330 U.S. 1 (1947)). Since that time, vast and "interlocking lines of cases applying the Clause in particular situations" have developed, such as one that attempts to govern the use of (potentially) non-secular imagery and text in passive displays (*e.g.*, the Ten Commandments) and another that counsels what is (not) appropriate in an educational setting (*e.g.*, prayer in the public school system). *Indian River Sch. Dist.*, 653 F.3d at 269. These two branches of the jurisprudence have met on occasion, and it appears that courts should give those situations special attention. *See, e.g.*, *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), *summarily rev'g* 599 S.W.2d 157 (Ky. 1980); *see generally Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 564 (8th Cir. 2009) ("The courts must be 'particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.'") (quoting *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987)). A question that remains is what tests are available to explore a potential constitutional violation attendant to displaying the monument at issue in a school setting.

**B. Establishment Clause Jurisprudence**

Throughout the turbid history of Establishment Clause jurisprudence, the Supreme Court has announced no less than four judicially crafted "tests" to analyze whether governmental action violates the Constitution: the three-part "*Lemon* test" derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971); the "endorsement test" first advanced by Justice O'Connor in *Lynch v.*

*Donnelly*, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring) and later interpreted as essentially the second *Lemon* prong; the "coercion test" pronounced in *Lee v. Weisman*, 505 U.S. 577 (1992) and applied in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000); and the "legal judgment test" formulated by Justice Breyer is his concurrence in *Van Orden v. Perry*, 545 U.S. 677, 698-706 (2005) (plurality) (Breyer, J., concurring).  Several members of the Supreme Court have also theorized that other tests should govern, although their proposals have not garnered majority support.  *See, e.g.*, *Van Orden*, 545 U.S. at 693-94 (Thomas, J., concurring) (noting that "[e]ven if the Clause is incorporated," the Court should return to "the original meaning of the word 'establishment'" as the Framers understood the term) (citation omitted and alteration in original).  Notably, "[n]o fewer than seven times since 1983 has the Supreme Court decided an Establishment Clause case without applying *Lemon*."  *Am. Civil Liberties Union of Kentucky v. Mercer County*, 432 F.3d 624, 635 (6th Cir. 2005) (collecting cases).

This conglomerate of mixed messages has not only caused some confusion among the lower courts and litigants alike, but also resulted in a division among the circuits over which test applies to passive displays challenged under the Establishment Clause.  *See Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, -- U.S. --, 132 S. Ct. 12, 15-16 (2011) (Thomas, J., dissenting from denial of certiorari) ("This confusion has caused the Circuits to apply different tests to displays of religious imagery challenged under the Establishment Clause."); *see also* John E. Nowak and Ronald D. Rotunda, Constitutional Law 1570 (8th ed. 2010) ("To say that Justice Breyer's opinion concurring in the judgment in *Van Orden* will provide little guidance to lower court judges when they consider establishment clause challenges to government displays would be an understatement.").  Despite sweeping calls for clarity in this judicially-created framework,

this is the present state of our jurisprudence on the matter. *See, e.g.*, *Mount Soledad Mem'l Ass'n v. Trunk*, -- U.S. --, 132 S. Ct. 2535, 2535 (2012) (Alito, J., respecting the denial of the petitions for writs of certiorari) ("This Court's Establishment Clause jurisprudence is undoubtedly in need of clarity."); *Utah Highway Patrol*, 132 S. Ct. at 15 n.3 (collecting cases where courts have described Establishment Clause jurisprudence as "a mere *ad hoc* patchwork," "purgatory," "limbo," "[a] chaotic ocean," and "indefinite and unhelpful") (citations omitted); *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 872 (7th Cir. 2012) (en banc), *petition for a writ of certiorari filed* No. 12-755 (Dec. 20, 2012) (Posner, J., dissenting) ("The case law that the Supreme Court has heaped on the defenseless text of the establishment clause is widely acknowledged, even by some Supreme Court Justices, to be formless, unanchored, subjective and provide no guidance.").

Accordingly, there is little doubt then why the parties in this case seemingly cannot agree on what test controls, let alone whether their counterpart(s) even correctly characterized this body of law. *See, e.g.*, Resp. Br. in Opp'n to Def.'s Mot. to Dismiss and Def.'s Mot. to Strike at 8, ECF No. 18 ("[B]ecause Defendant mischaracterizes much of the Establishment Clause jurisprudence examined in that portion of its Brief, Plaintiffs first address these matters in this Respones."). The Court endeavors to provide the parties with some degree of clarity as we move forward.

1. The *Lemon* Test

In 1971, the Supreme Court decided *Lemon v. Kurtzman* in which it articulated the now-familiar three-part test for assessing alleged Establishment Clause violations. 403 U.S. at 612-13. To assess the constitutionality of challenged government conduct, a court must ask the following: "(1) whether the government practice had a secular purpose; (2) whether its principal

or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion." *Indian River Sch. Dist.*, 653 F.3d at 271 (citing *Lemon*, 403 U.S. at 612-13).

The Court of Appeals for the Third Circuit recently reiterated the controlling standards under these three prongs. *See Indian River Sch. Dist.*, 653 F.3d at 283-89. Part one of the test, the secular purpose prong, asks "whether government's actual purpose is to endorse or disapprove of religion." *Id.* at 283 (internal quotation marks and citation omitted). Under *Lemon,* a challenged action will survive this inquiry if there is some sincere secular purpose that is not a mere sham. *Id.* at 283-84 (citations omitted). Part two of the test, the primary effect prong, mandates that "a state's practice can neither advance, nor inhibit religion." *Id.* at 284. That is, "regardless of its purpose, the government practice cannot symbolically endorse or disapprove of religion." *Id.* at 284 (internal quotation marks and citation omitted). At this level, a court "must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion," which requires a court to "adopt the viewpoint of the reasonable observer." *Id.* at 284 (citations omitted). Part three of the test, the excessive entanglement prong, focuses on "the character and purpose of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Id.* at 288 (internal quotation marks and citations omitted). In doing so, a court "must also bear in mind that 'excessive entanglement' requires more than mere interaction between church and state, for some level of interaction has always been tolerated." *Id.* (alterations,  internal quotation marks and citations omitted). Applying these factors, a court will invalidate the government action if it fails to satisfy any one of the three prongs. *See id.* at 283-84.

For example, in *Stone v. Graham*, the Supreme Court applied *Lemon* to displays of the Decalogue for the first time and held that a Kentucky statute which mandated that a copy of Ten Commandments hang on the walls of each public school classroom violated the first prong of the test. 449 U.S. at 39-43. To the Court, "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls [was] plainly religious in nature," rather than for an allowable secular purpose such as integration into the study of "history, civilization, ethics, comparative religion, or the like." *Id.* at 42 (citation omitted). This distinction, as in other Establishment Clause cases, was necessarily fact-intensive. *See Freethought Soc. of Greater Philadelphia v. Chester County*, 334 F.3d 247, 262 (3d Cir. 2003) ("[W]e conclude that *Stone* is fairly limited to its facts."). To be sure, "*Stone* did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key." *McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 867 (2005) (citation omitted); *see Freethought Soc. of Greater Philadelphia*, 334 F.3d at 262 ("[W]e do not believe that *Stone* holds that there can never be a secular purpose for posting the Ten Commandments, or that the Ten Commandments are so overwhelmingly religious in nature that they will always be seen only as an endorsement of religion.").

Since *Stone*, the criticism particularly directed toward the continued use of the *Lemon* test has been both well-documented and far-reaching. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring) (collecting opinions and comparing *Lemon* to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried"). Nevertheless, the Supreme Court reaffirmed the vitality of its use as recently as 2005 in *McCreary County*, focusing heavily on the potentially modified first prong. *McCreary Cnty.*, 545 U.S. at 859-66; *see Am. Civil Liberties*

11

*Union of Kentucky*, 432 F.3d at 635 ("After *McCreary County*, the first [prong] is now the predominant purpose test.").

In that case, the Court addressed whether the posting of the Ten Commandments at two county courthouses violated the Establishment Clause. *McCreary Cnty.*, 545 U.S. at 850-82. Justice Souter, writing for the majority, began the discussion with a critical focus on the evolution of the displays throughout the litigation. *Id.* at 852-59. Originally, the Counties posted standalone gold-framed copies of the King James version of the Ten Commandments with a citation to the Book of Exodus in their respective courthouses. *Id.* at 851-52. The ACLU of Kentucky brought suit, prompting both Counties to authorize modifications of the displays to include eight other documents in smaller frames with "each either having a religious theme or excerpted to highlight a religious element." *Id.* at 853-54. Shortly thereafter, the district court entered a preliminary injunction and ordered the displays removed immediately. *Id.* at 854. Although the Counties initially filed a notice of appeal, they voluntary dismissed it after hiring new counsel and installed a third version of the display. *Id.* at 855. That exhibit, entitled "The Foundations of American Law and Government Display," consisted of nine equally-sized framed documents: the King James Version of the Ten Commandments assembled with "copies of the Magna Carta, the Declaration of Independence, the Bill of Rights, the lyrics of the Star Spangled Banner, the Mayflower Compact, the National Motto, the Preamble to the Kentucky Constitution, and a picture of Lady Justice." *Id.* at 855-56. After the installation of this final display, the trial court supplemented the injunction to include that arrangement, and a divided panel of the Court of Appeals for the Sixth Circuit affirmed. *Id.* at 856-58. The Supreme Court ultimately granted certiorari. *Id.* at 858.

A divided Supreme Court likewise affirmed the grant of preliminary injunction, initially dispatching most of the Counties' attacks on *Lemon*'s purpose prong. *Id.* at 860-67. Turning to the Counties' displays, the majority took *Stone* "as the initial legal benchmark, [its] only case dealing with the constitutionality of displaying the Commandments." *Id.* at 867. The Court first observed that the original display in the sequence shared similarities with the one rejected in *Stone*: "both set out a text of the Commandments as distinct from any traditionally symbolic representation, and each stood alone, not part of an arguably secular display." *Id.* at 868. Moreover, Justice Souter highlighted that "*Stone* stressed the significance of integrating the Commandments into a secular scheme to forestall the broadcast of an otherwise clearly religious message." *Id.* (citation omitted). But the Counties later attempts at integration would not suffice; the majority continued to examine the evolution of the displays and found that the Counties understandably refused to defend the second version and that the litigation history confirmed the lower courts' conclusion that no legitimizing secular purposes prompted the third version. *Id.* at 870-74; *see also Am. Civil Liberties Union of Kentucky*, 432 F.3d at 633-34 (noting that *McCreary County* involved an appeal from preliminary injunction and the Court could only review the decision under the deferential abuse of discretion standard). Again, the purpose prong of *Lemon* as applied to the display was critical to the outcome. *McCreary Cnty.*, 545 U.S. at 874.

The *McCreary* Court clarified this position in one important respect. *Id.* For the majority, it did not have occasion "to hold that a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history." *Id.* Rather, it only decided that that "purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context." *Id.* Thus, "an implausible claim that

governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense." *Id.*

    2.  <u>The Endorsement Test</u>

    Without discarding the *Lemon* test, the Supreme Court also set forth the related endorsement test in 1984. *See Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, 587 F.3d 597, 604 (3d Cir. 2009) (citing *Lynch*, 465 U.S. at 687-94 (O'Connor, J., concurring)). More recently, in *Doe v. Indian River School District*, the United States Court of Appeals for the Third Circuit took the opportunity to address both analyses when it determined that a school board policy of opening public meetings with a prayer or a moment of silence ran afoul of the Establishment Clause. 653 F.3d at 283-90. Although it focused its discussion heavily on the lines of cases governing prayer in the public school system and the legislative prayer exception, our court of appeals made some useful observations worth mentioning. *Id.*

    First, in deciding what "test" to apply, the panel highlighted that "[i]n the public school context, the Supreme Court has been inclined to apply the *Lemon* test." *Id.* at 282 (citing *Grand Rapids Sch. Dist. v. Ball,* 473 U.S. 373, 383 (1985)). The court did not, however, make this trend a bright-line rule for addressing challenged government conduct in that setting, such as when a passive display bearing the text of the Ten Commandments stands at the schoolhouse gate. *See id.* at 283.

    Second, the court decided to apply both the endorsement test and the *Lemon* test, as it had previously done in light of the critique the latter has faced. *Id.* at 283 (citing *Stratechuk*, 587 F.3d at 603; *Modrovich v. Allegheny Cnty.*, 385 F.3d 397, 406 (3d Cir. 2004)). Recognizing that "[t]he endorsement test and the second *Lemon* prong are essentially the same," *id.* at 282, our court of appeals explained that the same line of reasoning will apply to either standard, *id.* at 289.

3.   The Coercion Test

The next Establishment Clause approach, the coercion test found in *Lee v. Weisman* and *Santa Fe Independent School District v. Doe*, "looks at whether the government is coerc[ing] anyone to support or participate in religion or its exercise."   *Borden*, 523 F.3d at 175 n.18 (citations omitted).   "Where the coercion test belongs in relation to the *Lemon* test is less clear" than where the endorsement test sits.   *Elmbrook Sch. Dist.*, 687 F.3d at 850 (citations omitted). However, at least within the Third Circuit, the courts recognize that the test "focuses primarily on government action in public education and examines whether school-sponsored religious activity has a coercive effect on students."   *Modrovich*, 385 F.3d at 400-401 (citation omitted). The Supreme Court has in fact "not applied its coercion test outside the public education context," *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 175 n.37 (3d Cir. 2002), even though some have advocated that a modified version of it should apply in other circumstances, *Van Orden*, 545 U.S. at 693-98 (Thomas, J., concurring).

4.   The Legal Judgment Test

Most recently, the latest test emerged in *Van Orden v. Perry* where the Court struggled with what standard to apply when judging a challenged monument located on the grounds of the Texas State Capitol.   *See* 545 U.S. at 698-706 (Breyer, J., concurring).   Decided the same day as *McCreary County*, *Van Orden* declined to apply the familiar three factors to a governmental display described as an approximately six foot tall granite statute, bearing nearly identical inscriptions to the monument in this case and standing amongst several other memorials on public grounds.   *See McCreary Cnty.*, 545 U.S. at 850-66 (plurality), 698-706 (Breyer, J., concurring); *see also Card v. City of Everett*, 386 F. Supp. 2d 1171, 1173 (W.D. Wash. 2005), *aff'd*, 520 F.3d 1009 (9th Cir. 2008)) ("The average American who is not a constitutional scholar

may reasonably be mystified by the two Ten Commandment opinions issued by a deeply divided United States Supreme Court on June 27, 2005.").

Instead, two competing analyses materialized among the majority of the Justices that joined in the judgment of the Court which ultimately upheld the display of the Ten Commandments as constitutional. *Compare Van Orden*, 545 U.S. at 686 (plurality) ("Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds.") *with id.* at 703-04 (Breyer, J., concurring) ("[I]n reaching the conclusion that the Texas display falls on the permissible side of the constitutional line, I rely less upon a literal application of any particular test than upon consideration of the basic purposes of the First Amendment's Religion Clauses themselves.") (citations omitted).   First, writing for the four-Justice plurality, then-Chief Justice Rehnquist advanced the theory that the Establishment Clause analysis was "driven both by the nature of the monument and by our Nation's history."  *Id.* at 686 (plurality).   Second, Justice Breyer, who provided the critical fifth vote in each case, outlined that the message conveyed by a display must be "evaluated in light of its historic, temporal, and physical setting."  *Card*, 386 F. Supp. 2d at 1173.   While our court of appeals has yet to address which analysis prevails, other circuit courts have concluded that the concurring opinion of Justice Breyer ultimately controls under the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977).[1]   *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 650 F.3d 30, 49 (2d Cir. 2011), *cert. denied,* 132 S. Ct. 816 (2011); *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 807 n.17 (10th Cir. 2009) (internal quotation marks and citation

---

1.  The rule formulated in *Marks v. United States* instructs that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  430 U.S. 188, 193 (1977) (internal quotation marks and citation omitted).

omitted); *Staley v. Harris Cnty*, 485 F.3d 305, 308 n.1 (5th Cir. 2007) (en banc).  None of those rulings bind this Court, but some are certainly persuasive.

According to Justice Breyer, "[i]f the relation between government and religion is one of separation, but not of mutual hostility and suspicion, one will inevitably find difficult borderline cases" where there will be "no test-related substitute for the exercise of legal judgment." *Van Orden*, 545 U.S. at 700 (Breyer, J., concurring) (citations omitted).  "That judgment is not a personal judgment," but rather, "it must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes." *Id.* (citation omitted).  While the Court's other Establishment Clause tests provide "useful guideposts," this analytical framework recognizes that "no exact formula can dictate a resolution to such fact-intensive cases." *Id.*; *see Trunk v. City of San Diego,* 629 F.3d 1099, 1107 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2535 (2012) ("Notably, this inquiry does not dispense with the *Lemon* factors, but rather retains them as 'useful guideposts.'") (citation omitted).

Finding the matter a "borderline case," Justice Breyer also explained that a court "must examine how the text is *used*" in order to determine the message conveyed.  *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) (emphasis in original).  That inquiry, unsurprisingly, required a consideration into the context of the display.  *Id.*  To that end, Justice Breyer ultimately identified a number of factual considerations that weighed in favor of his conclusion that the display at issue withstood constitutional scrutiny: that the statute conveyed a mixed religious and secular messages; that the inscription denoted a private civic and primarily secular group donated the stone monolith; that the physical setting of the monument in a large park among seventeen other monuments and twenty-one historical markers proposed little or nothing of the sacred and

did not readily lend itself to religious activity; and that roughly forty years had passed without complaints about the statue's presence on public land. *Id.* at 701-05. This last consideration helped the Court "understand that as a practical matter of *degree* this display is unlikely to prove divisive," a critical factor for Justice Breyer under his pragmatic framework in that borderline case. *See id.* at 703-04 (emphasis in original).

At least one court has attempted to reconcile this viewpoint within the context of the prior Establishment Clause tests. *See Card v. City of Everett*, 520 F.3d 1009, 1016-22 (9th Cir. 2008) (determining that its study of *Van Orden* led to the conclusion that it "do[es] not use the *Lemon* test to determine the constitutionality of some longstanding plainly religious displays that convey a historical or secular message in a non-religious context"); *see Trunk*, 629 F.3d at 1107 (noting that this framework has only been developed in the Ninth Circuit, but that the "legal judgment test" incorporates a number of factors similar to a *Lemon*/endorsement test analysis). *But, c.f.*, Nowak & Rotunda, Constitutional Law 1570 (8th ed. 2010) (observing that "it is difficult to understand how anyone other than Justice Breyer could apply his analysis, which contains neither any formal tests nor any clear guideposts for how lower courts could anticipate [his] 'judgment.'"). Others have debated whether to apply one of the tests alone, resulting in a split among the circuits. *See Green*, 568 F.3d at 796-808 (applying *Lemon* and holding that although a Ten Commandment display surrounded by secular monuments on the courthouse green in a "place where everyone knows each other" was not presumptively unconstitutional, the reasonable observer would be aware of the religious motivation for seeking the erection of the Decalogue's text); *Am. Civil Liberties Union of Kentucky*, 432 F.3d at 631-40 (applying *Lemon* and holding that the challenged display at the local courthouse, which was identical to the third version of the display in *McCreary County*, did not violate the Establishment Clause); *ACLU*

*Nebraska Found. v. City of Plattsmouth*, 419 F.3d 772, 776-78, n.8 (8th Cir. 2005) (en banc) (applying *Van Orden* instead of *Lemon* to a very similar display in a city park and holding that the monument donated by the Fraternal Order of the Eagles was constitutional).

With these principles in mind, the Court turns to the arguments advanced by the parties in this case.

### C. Analysis

Plaintiffs operate under the theory that the placement of a monolith with the text of the Ten Commandments on public school grounds violates the various guideposts set forth in our Establishment Clause jurisprudence such that removal is justified.  From their perspective, the prominent nature of the Ten Commandment's text on the display constitutes an endorsement of religion lacking any secular purpose, evidencing a favored religious view within the district, advancing the tenets of a particular faith, placing coercive pressure on the schoolchildren plaintiffs to adopt that preferred belief system of the District, and usurping the parental right of Schaub and Doe 3 to raise their children as they see fit.  Plaintiffs also hold the opinion that their Complaint contains sufficient factual material to state a plausible claim for relief.  According to Plaintiffs, the Court should discard any other facts proffered by Defendant as unsuitable for judicial notice.

The School District adamantly disagrees and argues that Supreme Court jurisprudence forecloses this matter.  Defendant particularly focuses on the obvious facial similarities between the monument at issue in this case and the stone monolith upheld under the Establishment Clause by a fractured Court in *Van Orden*.  The School District does not go to any great lengths to explain away the distinguishing factual aspects of *Van Orden* which ultimately swayed a majority of the Justices to hold the monument withstood constitutionally scrutiny, including its

longstanding inclusion among numerous secular subjects and the historical lack of complaints directed toward its display on public grounds.  Instead, Defendant endeavors to apply a number of the other Establishment Clause tests to the challenged statue at Valley High School in an attempt to demonstrate that the monument withstands scrutiny under the *Lemon*/endorsement test and the coercion test as suggested by Justice Thomas in his concurring opinion from *Van Orden*.

Addressing those legal challenges aimed at the merits of their claim, Plaintiffs direct criticism at the School District for its attempt to derive a per se rule from the blurred, indistinct, and variable barrier between what is and what is not permissible under the Establishment Clause. Rather than an immediate application of *Van Orden*, Plaintiffs invite the Court to read the various lines of Establishment Clause cases as a somewhat synthesized body of law with any non-secular conduct receiving heightened judicial review when on public school grounds irrespective of whether the challenge only involves passive displays.  To the Plaintiffs, the School District wholly ignores their perceived distinction between non-secular activities or displays in the school setting and those exhibitions on other government property.  Thus, as Plaintiffs reason, Defendant cannot foreclose their claim at this time.

Perhaps the Court may later find Plaintiffs' position untenable and their requested relief unwarranted, but a fair reading of the Complaint at this stage of the proceedings leads to the conclusion that the factual allegations provided by Plaintiffs extend beyond conclusory, ipse dixit assertions to at least having stated a facially plausible claim.  Plaintiffs have adduced sufficient support to permit the Court to draw the reasonable inference that the claim Plaintiffs advance has sufficient merit under our current jurisprudence.  Certainly, the Court may only consider the well-pleaded factual averments that it is bound to accept as true at this juncture.

Likewise, a review of the record reveals that there is no meaningful evidence to support the School District's attack on the merits of Plaintiff's case and thus the "foreclosure" argument is unavailing at this time.  A semblance of judicially noticeable facts does not alter this outcome. The School District cannot readily expect this Court to interpret the facets of the challenged monument and grant the relief requested based on the facts it attempts to inject into the record without the benefit of discovery.

Establishment Clause challenges are all unique and driven by the particular facts of the case.  Plaintiffs are entitled to a reasonable time in which they may conduct limited discovery in their attempt to garner support for the cause they pursue, such as developing evidence from sources other than the commentary posted by board members with regard to the School District's purpose for accepting and maintaining the monument.  Discovery will also afford Defendant the opportunity to inquire deeper into whether particular hypersensitivities exist such that the viewpoint of a reasonable observer would differ, uncover the historical background of the monolith, and confirm the claimed nature of the content on the display.  Throughout, the parties will have had ample opportunity to build a sufficient factual record that permits this Court to meaningfully apply the decisional law to this difficult context-driven task.

## Conclusion

Based on the foregoing reasons, the Motion to Dismiss and the Motion to Strike will be denied in their entirety.  An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FREEDOM FROM RELIGION FOUNDATION,
**INC., DOE 1** *by DOE 1's next friend and parent,*
*MARIE SCHAUB,* **MARIE SCHAUB**
*who also sues on her own behalf,* **DOE 2**
*by Doe 2's next friend and parent DOE and* **DOE 3**
*who also sues on Doe 3's own behalf*

        **Plaintiffs,**

        **v**

NEW KENSINGTON-ARNOLD SCHOOL
DISTRICT,

        **Defendant.**

)
)
)
)
)   **2:12-cv-1319**
)
)
)
)
)
)
)
)
)
)
)

## ORDER OF COURT

AND NOW, this 22nd day of January 2013, in accordance with the with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION TO DISMISS AND MOTION TO STRIKE PURSUANT TO FEDERAL RULES 12(B)(6) AND 12(F) (Doc. No. 8), filed by Defendant New Kensington-Arnold School District, is **DENIED**.

Defendant shall file an Answer to Plaintiffs' Complaint on or before February 5, 2013. The parties shall file their 26(f) report and ADR stipulation on or before February 19, 2013. The initial Case Management Conference is hereby scheduled on Friday, February 22, 2013 at 10:00 AM in Courtroom 6C.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:   **Marcus B. Schneider, Esquire**
      Email: marc.steelelawoffice@gmail.com

      **Amie A. Thompson, Esquire**
      Email: AThompson@andrewsandprice.com
      **Anthony G. Sanchez, Esquire**
      Email: asanchez@andrewsandprice.com