## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC.; DOE 1, by Doe 1's next friend and parent MARIE SCHAUB, who also sues on her own behalf, | : : : : : | C.A. No. 12-1319 |
| | : | Electronically Filed |
| | : : | Judge Terrence F. McVerry |
| Plaintiffs, | : | |
| vs. | : : | JURY TRIAL DEMANDED |
| NEW KENSINGTON-ARNOLD SCHOOL DISTRICT, | : : : : | |
| Defendant. | : | |

### APPENDIX TO DEFENDANT'S
### CONCISE STATEMENT OF MATERIAL FACTS AND
### CORRESPONDING BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

### VOLUME I

Dated:    December 12, 2014

Respectfully submitted,

SANCHEZ LEGAL GROUP, LLC

By:    /s/ Anthony G. Sanchez, Esquire
       Anthony G. Sanchez, Esquire
       PA I.D. #55945
       2403 Sidney Street, Suite 242
       River Park Commons
       Pittsburgh, PA 15203
       412-904-3200
       asanchez@sanchezlegalgroup.com

       Attorneys for Defendant

# TABLE OF CONTENTS

**Page(s)**

**Volume I**

Affidavit of E. J. Ruegemer ........................................................................ A.1

Excerpts from the Deposition of George Batterson ................................... A.4

Excerpts from the Deposition of Marie Schaub ....................................... A.20

**Volume II**

Excerpts from the Deposition of Superintendent John Pallone ................ A.47

Excerpts from the Deposition of Robert M. Pallone, Sr. .......................... A.54

Excerpts from the Deposition of Doe 1 ................................................... A.66

Affidavit of Jennifer Retter ..................................................................... A.73

Affidavit of Sonny Zampogna .................................................................. A.74

Affidavit of Dante Cicconi ....................................................................... A.75

Affidavit of Marc Licata ........................................................................... A.76

Affidavit of David Jack ............................................................................. A.77

Affidavit of Mark Lukac ........................................................................... A.79

Affidavit of Johanna Jack ........................................................................ A.80

Affidavit of Robert Sauro ........................................................................ A.81

EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| WILLIAM A. BOOKS and MICHAEL SUETKAMP, | ) | CASE NO. 3:98CV0230AS |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF ELKHART, | ) | |
| Defendant | ) | |

**AFFIDAVIT OF E. J. RUEGEMER**

E. J. Ruegemer hereby states as follows:

1.    I was born July 29, 1902.  I currently reside in Alexandria, Minnesota.
With respect to the above-captioned matter, because of my age, I do not
wish to travel to South Bend, Indiana, or to participate in any formal legal
proceedings, other than to prepare this affidavit for possible use in the
above-captioned matter.

2.    I am retired from the Stearns County Juvenile Court bench, where I
served as a judge from 1941 to 1947, and the State of Minnesota
District Court bench from 1947 to 1967.  In my private life, as one way
to participate in civic affairs, I was Chief Justice and Chairman of the
Youth Guidance Committee of the Fraternal Order of Eagles.

3.    In my work as a juvenile court judge, I came in frequent contact with
youngsters who were in trouble with the law.  It seemed to me that
many of them were without any code of conduct or standards by which
to govern their actions.  About the year 1943, it occurred to me that

A.1

NewKen-Arnold 00127

they could benefit from exposure to one of mankind's earliest codes of conduct, the Ten Commandments. This was not to be religious instruction of any kind, but to show these youngsters that there were such recognized codes of behavior to guide and help them. I developed the idea of posting a copy of the Ten Commandments in each juvenile courtroom in the State of Minnesota and later in juvenile courtrooms throughout the country.

4.      Such a program would require funding. I presented this idea to the Fraternal Order of Eagles, seeking their support. Initially, the idea was rejected by the Eagles because it was felt this might seem coercive or sectarian. Eventually, however, representatives from the Jewish, Protestant, and Roman Catholic communities joined together and developed a version of the Ten Commandments which was not identified with any one religious group; and on this basis, the Eagles agreed to support such a Youth Guidance program.

5.      While this program was being developed, I received a telephone call from motion picture producer Cecil B. DeMille, who was making a film called the "Ten Commandments". He told me that he thought the program was a wonderful idea and suggested that rather than paper copies, the Ten Commandments be put on bronze plaques for distribution throughout the country. I said that since the original Ten Commandments were on granite that this would be an even more suitable material. He agreed, and I worked with two local Minnesota granite companies to produce

NewKen-Arnold 00128

A.2

granite monuments inscribed with the Ten Commandments.  Local aeries of Eagles throughout the country paid for monuments which they presented to their communities.

6.   Ceremonies were held in connection with the presentation of most of the monuments and some were attended by the film actors who appeared in the Cecil B. DeMille movie; by city, county, and state officials; the Boy Scouts of America; and other civic organizations.  Charleton Heston, who played Moses in the film, appeared at one ceremony, and Martha Scott, who played the mother of Moses, appeared at another.

I affirm under the penalties for perjury that the foregoing representations are true.

Dated this  22  day of September, 1998.

E. J. Ruegemer

<pre>
 1          THE UNITED STATES DISTRICT COURT FOR THE

 2            WESTERN DISTRICT OF PENNSYLVANIA

 3      -------------------------------------------------

 4   FREEDOM FROM RELIGION FOUNDATION, INC., DOE 1,
     by DOE 1's next friend and parent, MARIE
 5   SCHAUB, who also sues on her own behalf, DOE
     2, by DOE 2's next friend and parent DOE 3,
 6   who also sues on DOE 3's own behalf,

 7            Plaintiffs,

 8      -vs-

 9   NEW KENSINGTON-ARNOD SCHOOL DISTRICT,

10            Defendant.
     -------------------------------------------------
11       Examination Before Trial of GEORGE

12   BATTERSON, held before Brittany M. Whelan,

13   Notary Public, at 170 Franklin Street, Suite

14   601, Buffalo, New York, on May 6, 2014 at

15   10:00 AM, pursuant to notice.

16
     APPEARANCES:    STEELE SCHNEIDER
17                   BY: MARCUS B. SCHNEIDER, ESQ.,
                     428 Forbes Avenue, Suite 700
18                   Pittsburgh, Pennsylvania 15219
                     (412) 235-7682
19                   Marcschneider@steeleschneider.com
                     Attorneys for the Marie Schaub
20                   and Doe 1

21                   ANDREWS AND PRICE
                     BY: ANTHONY SANCHEZ, ESQ.,
22                   1500 Ardmore Blvd., Suite506
                     Pittsburgh, Pennsylvania 15221
23                   (412) 243-9700
                     Attorneys for the Defendant
</pre>

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1      best to ask coherent questions.  Sometimes

2      there will be one that comes out kind of funny

3      and it's hard to make sense of.  If you don't

4      understand my question, just let me know that

5      and I'll try to rephrase it in a way that

6      makes sense.  If you do answer the question,

7      I'll assume you understood it as it was asked;

8      is that understood?

9  A. Okay.  Great.

10  Q. Okay.  I've had a chance to review a number of

11      documents in this case that I believe

12      represent emails that you authored.  Based

13      upon those documents, I came away with the

14      conclusion that you are a practicing

15      Christian; would that be fair to say?

16  A. Yes.

17  Q. And do you identify with any particular sector

18      denomination of Christianity?

19  A. I'm a Episcopalian actually by birth, but I've

20      been going to a Christian Church this last

21      year.

22  Q. Okay.  And in your time at the District, how

23      long were you superintendant there?

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1    A. Five years.

2    Q. Okay.  And that would be from 2007 to 2012?

3    A. Yes.

4    Q. Okay.  And with respect to your religious

5       views during your tenure at the District,

6       would you say that you would have considered

7       yourself a Christian throughout your time

8       there?

9    A. Yes.

10   Q. And with respect to any particular

11      denomination, any shifts or changes during

12      that time?

13   A. No.  At the time I attended the Episcopal

14      Church occasionally in New Kensington, but

15      actually I didn't go to church that much when

16      I was superintendent there.  Since I came back

17      here to Buffalo I've been going to a Christian

18      Church every Sunday up here in Buffalo.

19   Q. Okay.  I just want to try to get an idea

20      whether I'm going to need to specify in a

21      certain time period when I'm asking questions

22      whether your views have changed.  We'll just

23      deal with that as we go along.

1      some former students, and had indicated that

2      you would say a little prayer when you walked

3      by the Ten Commandments monument at the high

4      school whenever you were present; does that

5      ring a bell?

6    A. It's true.  I did write that to a couple of

7      students in emails.  And yes, because I was

8      walking around the high school frequently and

9      often going to sports events especially, we

10     would talk by the Ten Commandments.  They're

11     actually not at the main entranceway.  They're

12     at kind of a sports entranceway.  But when I

13     walked by them sometimes I would say a silent

14     prayer.

15   Q. Okay.  And you sort of anticipated perhaps,

16     one of my questions was whenever you were

17     moved to pray at the Ten Commandments, was it

18     a silent practice or was it not silent?

19   A. It was silent.  No one would ever know I was

20     praying.

21   Q. Okay.  And now do you recall there being

22     anywhere else on the Valley High School

23     grounds other than at the Ten Commandments

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1     monument where you were moved to prayer?

2  A. Well, no.  There's nothing like the monument

3     that is there or anything, but I pray all the

4     time actually.  Especially when I was the

5     school superintendant.  I used to ask God to

6     try to help me to help the children.  I

7     actually do a lot of silent prayers during the

8     day.

9  Q. Okay.  But I think the first part of your

10    answer you said there's really no other

11    structures on the school ground that moved you

12    to prayer?

13 A. Right.

14 Q. Okay.  And now, at some point you received a

15    letter from the Freedom From Religion

16    Foundation requesting that the monument at the

17    school be removed; do you recall that?

18 A. Yes.

19 Q. And would it be fair to say that you saw that

20    as an opportunity to sort of affirm the word

21    of God?

22 A. No.  I don't believe so.  I did receive the

23    letter and I took the letter to my Board of

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1   School Directors in executive session and had

2   them read it.  What happened -- I guess I'll

3   tell you about it.  I received the letter and

4   I took it to executive session at the Board

5   meeting.  I read the letter to the Board of

6   School Directors.  I didn't even say a word.

7   I just read them the letter and said we

8   received this and you should be aware of it.

9   After I finished speaking and reading the

10  letter, all of the Board Members, all nine of

11  them said that I should consult with legal

12  counsel about this because they wanted to keep

13  the monument on the front lawn of the high

14  school.

15 Q. Okay.  And do you recall if one of your

16  solicitors or other legal counsel was present

17  during that meeting?

18 A. I believe Tony Vigilante [phonetic] was

19  present because he was always in our executive

20  sessions.

21 Q. Okay.  And so you referenced the Board, and I

22  think I have the name of the Board Members at

23  that time and if I could just run through them

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1        to make sure it sounds right and I know it may

2        be asking you to remember a lot but maybe you

3        do know.  At that time was Robert Pallone the

4        president of the Board?

5    A.  Yes.

6    Q.  And do you recall, Dr. Batterson, a gentleman

7        by the name Jason Fularz being the vice

8        president of the Board?

9    A.  At that time I don't think Jason was on the

10       Board when we first received the letter but

11       I'm not positive.  You'd have to look back on

12       the date of the letter.

13   Q.  Okay.  I can check that.  Do you recall Regina

14       Namey being on the Board at that time?

15   A.  It's the same answer.  I don't know whether

16       Regina was on when we received the letter.

17       She's a new member and so is Jason.

18   Q.  Okay.  Since I can verify that, let me just

19       ask you this, and you may have already said

20       this in your earlier response, were there any

21       of the Board Members, whenever you initially

22       presented them with this letter, that sided

23       with removing the monument?

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1        monument being present on the District

2        property?

3    A.  I noticed it during the interview process when

4        I was interviewing for the superintendant

5        because I happened to be told to go in that

6        entranceway instead of the main entranceway

7        and I noticed it then.

8    Q.  Okay.  And that would have been back in 2007,

9        right?

10   A.  Yes.

11   Q.  Okay.  Between 2007 and your receipt of the

12       letter, do you recall discussing the monument

13       with anyone, any District employees?

14   A.  No, never.  In fact, no one ever commented on

15       it ever until I got the letter from the

16       Freedom From Religion Foundation.

17   Q.  Okay.  So just for clarity, that would cover

18       students as well?  There was no discussion

19       with students about the monument?

20   A.  No, never.  No one ever objected to it or said

21       anything about it.

22   Q.  And you're referring to your time at the

23       District?

1     and now, have you ever read the entirety of

2     the monument?

3  A. I don't know that.  I don't remember ever

4     stopping and actually looking at it and

5     reading them.  I knew what it was, but I don't

6     actually remember standing in front of the

7     monument ever and reading them.  I used to

8     walk by it a lot.

9  Q. Sure.  But is it fair to say from very early

10    on, perhaps your first encounter with it, you

11    recognized it to be the Ten Commandments?

12  A. Yes, I did.

13  Q. Okay.

14  A. Especially when I got the letter from the

15    Freedom From Religion Foundation I'm sure that

16    I looked at it really in detail then because I

17    do remember the Star of David was on it and so

18    knowing that means that I took a good look at

19    it.  I really was not that -- it really was

20    never anything of any issue or discussion

21    amongst any of us, but after I got the letter,

22    I looked at it I think better.

23  Q. Okay.  Do you recall having any difficulty

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1        petition, we would have reprimanded that.

2    Q. Why is that?

3    A. Because we should not be doing that.  We're

4        not trying to instill religious beliefs in our

5        students, we're just trying to educate them.

6        The controversy over the Ten Commandments

7        should be handled by our legal counsel.

8        There's no way we should be trying to go out

9        and get support, you know, actively getting

10       support for the Ten Commandments.

11   Q. Okay.  Well -- so as you read through this

12       P-2, do you find it to be that the statement

13       contained in there to be inconsistent with

14       what you understood the District's position on

15       the issue to be?

16   A. The District's position on the issue was that

17       it's a historical landmark and -- let me just

18       read this again.

19   Q. Sure.

20   A. After sincerely it says I'm signing this

21       because of the historical significance, that's

22       good; we would agree with that.  But then it

23       goes on to say I want to clarify that the Ten

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1    MR. SCHNEIDER:  Sure.

2    MR. SANCHEZ:  And make sure it's

3  employees and not Board Members.

4    MR. SCHNEIDER:  Sure.

5

6  BY MR. SCHNEIDER:

7  Q. Previously you testified that you were

8     approached by, I think you said some teachers

9     and principals, I believe that was your

10    response.  You can correct me if I'm wrong.

11  A. Right.

12  Q. So was that your testimony?

13  A. Yes, that's true.

14  Q. Okay.  So you recall in certain situations

15    being approached by specific teachers who were

16    expressing support for the decision?

17  A. Yes.

18  Q. Do you recall whether any of those

19    conversations involved a statement of support

20    that you felt was based upon a religious

21    reason?

22  A. I really do not recall anyone saying that to

23    me.  Mostly I remember people saying that they

1   supported our stance, that it was a historical

2   monument.  But mostly what I remember most of

3   the conversations were saying why does this

4   group from Wisconsin want to impose their will

5   on us.  Why don't they just mind their own

6   business.  That's really about what 90 percent

7   of the people kept saying to me.

8   Q.  Okay.  Do you agree or do you also believe

9       that the monument was historic?

10  A.  Yes.

11  Q.  And in what ways do you believe that the

12      monument was or still is historic?

13  A.  Because it was donated by the Fraternal Order

14      of the Eagles in 1957 and it's been there so

15      long.  It's become a part of the front lawn of

16      the high school for all of those years.  I saw

17      it more of a historical significance because

18      we never tried to impose any religious beliefs

19      on our children.  It was a public high school

20      and our mission was to try to educate the

21      students and not try to instill values in

22      them.  So I just think that it had been there

23      a long time and it's related to the school

1    because of the fact that it's been there since

2    the school was constructed.

3  Q. Okay.  So the historic aspect of the monument

4    in your mind comes from essentially 50 plus

5    year tenure in the position that it's

6    currently in?

7  A. Right.

8  Q. Okay.  Do you recall when you came to learn

9    about how the monument was originally placed

10   in it's current location?

11 A. I think it was after I received the letter

12   when I was told.  I mean, really it was a

13   pretty insignificant thing.  There was never

14   any discussions about it or anything until

15   after the letter was received and then we

16   started looking into it with our attorneys and

17   people started talking about it.

18 Q. If you recall, do you feel that you would have

19   found the monument to be historic when you

20   first saw it in 2007?

21 A. The first time I saw the monument I didn't

22   know anything about it really.  When I walked

23   into the entranceway, I just noticed that it

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1          Sarah Castanza [phonetic], is that Danielle's
2      mom?
3  A.  Yes.   That's my sister, Danielle's mom.
4  Q.  Okay.   All right.   Just call your attention to
5      the third paragraph from the bottom.
6  A.  Okay.
7              MR. SANCHEZ:   Which document?   P-8 or
8      P-9?
9              MR. SCHNEIDER:   P-9.
10  Q.  The sentence begins I have the total support;
11      do you see that?
12  A.  Yes.
13  Q.  Reading a little further it says I have the
14      total support of the students in my school.
15      Did you have any conversations with students
16      at the school about how they felt about the
17      issue of the Ten Commandments?
18  A.  Students would say to me that they supported
19      the District's stance just like teachers would
20      say.
21  Q.  Okay.   About how many students would you say
22      approached you and told you that they
23      supported the stance?

1   A.  I don't know, Marc.  I could guess.

2           MR. SANCHEZ:  No.  You can't guess.

3           THE WITNESS:  Okay.

4   Q.  Well, would it be fair to say that you talked

5       to enough students on the issue that you felt

6       pretty comfortable saying that there was

7       unanimous support among the students?

8   A.  I think there was unanimous support amongst

9       the student body, yes.  I didn't really have

10      big discussions with them about it.  They

11      would be saying just like teachers that we

12      support your stance, we're happy the monument

13      is there; that kind of thing.

14  Q.  Okay.  When I asked you previously about your

15      personal reaction to that letter in March, we

16      got into the meeting with the Board and that,

17      you know, you said that basically you would

18      have done what they directed.  Going back to

19      that, did you have a personal preference that

20      the monument stay when you received the

21      letter?

22  A.  Yeah.  When I received the letter, I did want

23      to have the monument stay.

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1       I never really asked questions about when was

2       it put there or we didn't talk about it.

3  Q. And in fact, I think Mr. Pallone said he

4       didn't even know it was the Ten Commandments

5       monument until the letter was sent.  Did you

6       have some other, not to suggest that he told

7       you that, but did you have any individuals

8       express that point of view to you?

9  A. No.  I don't remember anyone saying that.  I

10      remember people saying to me that they don't

11      even notice it.  It's not really conspicuous,

12      it's just there.

13  Q. Okay.  Was your personal preference that the

14      monument say motivated at all by your

15      religious views?

16  A. Yeah.

17      MR. SANCHEZ:  Objection to vague.  At

18    what time period?

19      MR. SCHNEIDER:  Sure.  That's fair.

20  Q. We had just been discussing your initial

21      reaction and that's where I want to focus my

22      question.  You initially received this letter

23      and your sort of immediate response is that

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

| | |
|---|---|
| FREEDOM FROM RELIGION | * |
| FOUNDATION, INC.; DOE | * |
| 1, by Doe 1's next | *Civil Action No. |
| friend and parent | *12-1319 |
| MARIE SCHAUB, who | * |
| also sues on her own | *JURY TRIAL |
| behalf; DOE 2, by | *DEMANDED |
| Doe 2's next friend | * |
| and parent DOE 3, | * |
| who also sues on Doe | * |
| 3's own behalf, | * |
| Plaintiffs | * |
| vs. | * |
| NEW KENSINGTON-ARNOLD | * |
| SCHOOL DISTRICT, | * |
| Defendant | * |

ORIGINAL

* * * * * * * *

DEPOSITION OF

MARIE SCHAUB

April 18, 2014

Any reproduction of this transcript is
prohibited without authorization by the
certifying agency.

26

1    Q.      Is it your testimony that the Ten

2    Commandments monument is situated

3    directly in front of the main entrance of

4    the School District?

5    A.      Of the high school, yes.

6    Q.      Okay.  I'd like you to go to page

7    --- let me get this right, third

8    paragraph --- let's go to page six.  Do

9    you see paragraph 27 reads and I quote,

10   Plaintiff, Doe 1 attends Valley

11   School and has been exposed to the Ten

12   Commandment monument at Valley

13   School when visiting the school on

14   various occasions.  Do you see that?

15   A.      Yes.

16   Q.      Is that true and accurate as far as

17   you know?

18   A.      Yes.

19

20

21

22

23

24

25

32

1    numerous occasions to drop off your

2    sister, so your sister could attend to

3    necessary business at the school

4    regarding her child, such as orientation;

5    is that --- is that correct?

6    A.    Yes.

7    Q.    Okay.  On those occasions, you

8    accessed the school through the primary

9    access road; is that correct?

10   A.    Yes.

11   Q.    Okay.  How many occasions do you

12   think those were?

13   A.    The amount listed.  I'd say one,

14   two ---.

15   Q.    Let me make ---.

16   A.    Yeah, I'm not sure.

17   Q.    This is more clear because that

18   isn't right.

19   A.    Okay.

20   Q.    How many times do you think that

21   you drove to the high school to drop your

22   sister off at the school so she could

23   attend to necessary business?

24   A.    Once or twice.

25   Q.    Okay.  And what time of day would

52

1    you dropped her off?

2    A.

3

4    Q.        Ok

5

6

7

8

9    A.

10   Q.

11

12

13   A.      I'm sure the gymnasium has several

14   different entrances.  That's what I'm

15   trying to tell you.

16   Q.      You believe there are several

17   entrances to the gymnasium from outside?

18   A.      I'm not sure.

19   Q.      Okay.

20   A.      I've only been to the school a

21   handful of times.

22   Q.      Okay.

23   A.      So I'm not familiar with the

24   architecture and the layout of their floor

25   plan.

53

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

77

1    Q.      Okay.  I got it.  Thank you.  When

2    we're going through these Interrogatories,

3    I'm trying to --- what I'm trying to ---.

4    OFF RECORD DISCUSSION

5    BY ATTORNEY SANCHEZ:

6    Q.      I apologize.  But so we're clear,

7    what I'm trying to understand is the times

8    that you've been exposed to the monument

9    and I'm using this to go there.  Okay?

10

11

12

13

14            and then the times you dropped

15   off your ---

16   A.      Sister.

17   Q.      --- your sister.  Those were the

18   times you were exposed to this; correct?

19   A.      Yes.

20   Q.      Is that all the times you were

21   exposed to this?

22   A.      Yes, I can't recall any other

23   times.

24   Q.      You can't recall any more?  Okay.

25   Good.

78

1   A.      I mean, you can --- it's visible

2   from the main road, but ---.

3   Q.      Is that your testimony, it's

4   visible from the main road?

5   A.      On our way here we could see it

6   from the main road.

7   Q.      Could you see the writing on the

8   monument from the main road?

9   A.      No, you can't.

10  Q.      Okay.

11  A.      But you know what it is and you

12  know what it says.

13  Q.      How do you know what it is?

14  A.      Because I've seen it before.

15  Q.      Well, we've talked about three

16  times, I believe; right?  We talked about

17  you personally,

18  but you.  We talked about the times you

19  dropped off your sister

20          Three times; right?

21  ʌ

22  ⌐

23  Q.      Okay.  Did you walk in or did you

24  just ---?

25  A.      Nope, I just sat outside the

80

1    --- how close do you get to it walking

2    down the walkway?  Would you say five

3    feet, ten feet?

4    A.      Probably approximately 15 feet.

5    Q.      So the closest you get to it when

6    you come down the walkway is 15 feet; is

7    that your estimate?

8    A.      Yeah, I'd say that's pretty close.

9    Q.      Okay.

10   A.      It's pretty big, you can't miss it.

11   Q.      Yes.  Do you know that there's no

12   lights on it; correct?  There's not a

13   light that lights it up?

14   A.      You mean during ---?

15   Q.      During the evening or during ---?

16   A.      I'm not aware of any lights, ---

17   Q.      Okay.

18   A.      --- other than during the day.

19   Q.      Yes.  That's fine.

20   A.      I wouldn't be on the school

21   property in the nighttime.

22   Q.      I think we're describing it well

23   verbally.  You're understanding what I'm

24   talking about, so I don't think we need a

25   picture.  Would you agree with me that all

82

1   pull up to the curb ---

2   BY ATTORNEY SANCHEZ:

3   Q.      Okay.

4   A.      --- near the steps.  So the sign

5   wouldn't be in the ---.  When was this

6   taken?  I'm thinking 2009?

7                   ATTORNEY THOMPSON:

8                   No.

9   BY ATTORNEY SANCHEZ:

10  Q.      Whoops, I'm sorry.

11  A.      That's okay.  Okay, 2014.  I

12  haven't been to the school in a couple of

13  years and I don't recall this gymnasium

14  pool sign here in the front.

15  Q.      Okay.  Do you know whether or not

16  it was there?

17  A.      I don't recall seeing that sign

18  before.

19  Q.      But you can't say for certainty

20  that it wasn't there; can you?

21  A.      I can't say that it wasn't there,

22  but I don't recall seeing that sign.

23  Q.      Fair enough.  Even if that sign

24  wasn't there, looking at that, is it your

25  testimony --- even if that sign wasn't

83

1   there, is it your testimony that from

2   that distance you were able to read what

3   was on that monument?

4   A.      No.  Not from this, no.

5   Q.      So from that distance, you couldn't

6   read the monument; is that correct?

7   A.      From this distance, no.  But I

8   wouldn't have pulled up at this distance.

9   I would have pulled up to the curb over

10  here.  And that's not the viewpoint that

11  I would have had.

12  Q.      Could you show me ---?  Mark here

13  with a --- we'll use an X again since

14  it's a different exhibit.  Mark where you

15  would have pulled up to.

16  WITNESS COMPLIES

17  BY ATTORNEY SANCHEZ:

18  Q.      Is it your testimony from where you

19  have marked on Exhibit 11, that you could

20  read the monument?

21  A.      No, I can't read the numbers.  I

22  think I could probably read Lord from

23  that.

24                  ATTORNEY SANCHEZ:

25                  Let's mark this as Number

84

1          12.

2                    (Schaub Deposition Exhibit

3                    12 marked for

4                    identification.)

5     A.     Where it says the Ten Commandments.

6     BY ATTORNEY SANCHEZ:

7     Q.     Okay.

8     A.     But then again I have 20/15

9     eyesight.

10    Q.     You think from where you marked on

11    Exhibit 11, you could read it said the

12    Ten Commandments?  What I'm giving you as

13    Number 12 is an even closer view.

14    A.     Yeah.

15    Q.     You'd agree with me that that's

16    closer than what I showed you in Exhibit

17    11; right?

18    A.     This is closer, obviously.

19    Q.     Yes.

20    A.     Yeah.  It's still at the end of the

21    footbridge.

22    Q.     Yes.

23    A.     I could probably make out

24    commandments.

25    Q.     If you were standing at the very

85

1    end of the footbridge on Exhibit 12 and

2    I'm going to put an X there.  Okay?

3    A.    Uh-huh (yes).

4    Q.    If you were standing there where

5    the X is ---

6    A.    Yep.

7    Q.    --- it's your testimony that you

8    could read the Ten Commandments there?

9    A.    I could read the word Commandments,

10   not all of the commandments.

11   Q.    Okay.

12   A.    But as I said, I have very good

13   eyesight.

14   Q.    Humorous choice of words.  Okay.

15   A.    The word Ten Commandments, yes.

16   The actual commandments, no.

17   Q.    Okay.  All right.  So going back to

18   Exhibit 11, Exhibit 11 where you circled,

19   that's where you say you were --- that's

20   where you observed every time

21

22

23   A.    Yes.

24   Q.    And where Exhibit 11 is marked in

25   the circle, is it your testimony from

91

1    Q.       When you walked --- no.  I know

2    you're saying you could.  I want to make

3    this clear.  When you walked down the

4    pathway, how much of it did you read at

5    the time that you saw it or the times

6    that you saw it walking past on the

7    walkway?

8    A.       I don't know that I stopped to

9    actually read any of it.

10   Q.       Okay.  Fair enough.

11   A.       Why would I?

12   Q.       I don't know.

13   A.       I saw the title on it, the Ten

14   Commandments, and I kept on walking.

15   Q.       So is it your testimony you don't

16   think you read anything, other than the

17   Ten Commandments being written on it?

18   A.       Sure, whenever I was in close

19   contact with it.  But I've read, you

20   know, the Ten Commandments several times.

21   Q.       I'm talking about this specific

22   monument.  I want to know ---

23   A.       Right.

24   Q.       --- if you ever when you walked by

25   it, read --- what you read, what you saw,

92

1    what you looked at.

2    A.      I saw the Ten Commandments at the

3    top of the monument.

4    Q.      Sure.  I understand that.  Did you

5    read any ---?

6    A.      I am thy Lord thy God.  That's it.

7    Q.      Did you read that part, too, the I

8    am the Lord thy God?  Did you read that,

9    too?

10   A.      Yes, I did, walking by it.  And

11   then as soon as I read that line, my

12   stomach turned and I just kept on

13   walking.

14   Q.      After you read I am the Lord your

15   God ---

16   A.      Thy ---.

17   Q.      --- thy God, pardon me, ---

18   A.      Yeah.

19   Q.      --- you read down to there and you

20   just quit reading it; is that correct?

21   A.      Correct.

22   Q.      How about above the Ten

23   Commandments?

24   A.      I don't know that that is even ---.

25   I didn't stop to look at that.  I don't

93

1   even know if that's English.

2   Q.      Okay.  You didn't read any of that?

3   A.      No, I didn't read any of the top.

4   Q.      I know there's a name for it and I

5   can't say it because I don't know this

6   stuff.  But the diamond shape with the

7   eyeball in the middle of it and the lines

8   around it, did you see that?

9   A.      Not at that event, no.

10  Q.      So when you read ---?  You could

11  see where it said the Ten Commandments, I

12  am the Lord thy God, but you never saw

13  the eyeball?

14  A.      No.

15  Q.      How about the eagle and the flag?

16  A.      I didn't make note of it, no. The

17  thing that jumped out at me was the Ten

18  Commandments, I am the LORD, in capital

19  letters, thy God.

20  Q.      Yes.

21  A.      AM in capital letters.  And as I

22  said ---.

23  Q.      You don't recall at the times you

24  walked by seeing either the eye or the

25  American flag or the eagle?

94

1    A.      No, I didn't pay attention to any

2    of it.

3    Q.      Okay.  Very good.  All right.

4    A.      I'm not even sure that I would make

5    note of it, other than in passing.

6    Q.      Okay.  I have sort of an odd

7    question for you.

8    A.      Yeah.

9    Q.      Looking at the Complaint, ---

10   A.      Yeah.

11   Q.      --- which is Exhibit Three, going

12   back to page six, ---

13   A.      Right.

14   Q.      --- we talked about the times where

15   you made contact with it and I think we

16   agreed they were when you were on the

17   street, either dropping your sister off

18   to do her business at the school

19

20

21

22

23

24   Q.      Okay.  So when you reference in

25   paragraph 32 necessary business at the

95

1    school, is that what you're talking

2    about?

3    A.    Yes.

4    Q.    Okay.  I didn't want to go back to

5    it.

6    A.    And at the time whenever I was

7    attending these events, it didn't even

8    occur to me --- I wasn't even educated on

9    the fact that they shouldn't be there.  I

10   was just kind of like --- you know, I

11   didn't even really realize that it was

12   inappropriate to have it there.

13   Q.    Are you talking --- you didn't

14   realize it was inappropriate when you

15   walked past it at the karate event?

16   A.    Right.

17   Q.    Okay.

18   A.    I didn't put two and two together

19   that ---

20   Q.    Okay.

21   A.    --- this is a religious monument

22   and it's on public school property.  I

23   kind of looked at it out of the corner of

24   my eye, didn't really think too much

25   about it and I just kept on walking.

98

1    Q.      Have you seen the Supreme Courtroom

2    in Pittsburgh of the Pennsylvania Supreme

3    Court?  It's in the Grant --- it's in the

4    --- pardon me, the City --- no, it's in

5    the --- yes, it is the ---.

6    A.      I've seen the Ten Commandments on

7    the outside of the county building, along

8    with other similar looking plaques, not

9    only referencing Abraham and God.

10   Q.      I think it's Moses.

11   A.      Abraham.

12   Q.      Okay.  Very good.  But you don't

13   have a problem with it being in those

14   Supreme Courtrooms?

15   A.      I think that public school and

16   children that are easily influenced is a

17   much different venue than, as I said,

18   other government buildings.

19   Q.      Do you understand that there are

20   some legal scholars that believe the Ten

21   Commandments are part of the grain and

22   substance of all law?

23   A.      I understand that some people

24   believe in Big Foot, but that doesn't

25   necessarily make it true.

1   Q.     Okay.  Well, this time try to

2   answer my question.

3   A.     I did.

4   Q.     No, you didn't.

5              ATTORNEY SANCHEZ:

6              Can you read back my

7       question?

8   COURT REPORTER READS BACK PREVIOUS

9   QUESTION

10  BY ATTORNEY SANCHEZ:

11  Q.     Of law, yes.  Of modern law.

12  A.     Yes, I understand that some

13  scholars believe that the earth is still

14  6,000 years old.  That doesn't make it

15  true, you know.

16  Q.     Are you suggesting that those

17  scholars that state that the Constitution

18  is part of the basis for American law is

19  incorrect?

20  A.     I understand that one, two, three,

21  four, five --- half of the Ten

22  Commandments have nothing to do with our

23  law.

24  Q.     I'll ask the question again.  I'm

25  going to ask it until you answer it.  Is

100

1    it your contention that any American

2    scholars that believe the Ten

3    Commandments are part and parcel to the

4    laws of the United States as they exist

5    today, that those people are wrong?

6    A.    I understand, yes.  But half of the

7    Ten Commandments are not law in our

8    United States.

9    Q.    Do you understand that there are

10   scholars that believe the Ten

11   Commandments are part of the basis and

12   part of the foundation for American law?

13   A.    I answered your question the first

14   time around, sir.  I said yes.  I

15   understand that some scholars may believe

16   that.  I understand that some scholars

17   may believe that this earth is 6,000

18   years old.  That doesn't make it true.

19   So I answered your question, sir.  The

20   answer is yes, I understand that people

21   have many different beliefs.

22   Q.    But my question, I wanted to get

23   that clear, because you didn't   ---

24   A.    Okay.

25   Q.    --- answer my question.  My

101

```
 1    question is do you disagree with those
 2    scholars?  Do you find those scholars
 3    wrong that say that --- make that ---
 4    take that position, that the Ten
 5    Commandments are part of the basis and
 6    part of the fabric of American law as we
 7    know it now?
 8    A.      I would disagree with that.
 9    Q.      You would disagree with them?
10    A.      I would disagree with them.
11    Q.      On what basis?
12    A.      Because that's my belief.
13    Q.      Do you have anything you can point
14    to other than your belief?
15    A.      Do you have anything that you can
16    point to?
17    Q.      It's not my deposition, ma'am.
18    A.      All right.  Well, then, no.
19    Q.      Is the answer no?
20    A.      The answer was yes, I believe that
21    there are people who believe --- scholars
22    who believe that the Ten Commandments are
23    part of, you know, American law and such
24    that ---.  My answer was yes.  I answered
25    the question.
```

102

1    Q.    Yes.   And then you said ---.

2    A.    I answered the question.

3    Q.    I said do you agree with them?   And

4    you ---.

5    A.    I answered the question.

6    Q.    I'm trying to get the answer.

7    A.    I answered the question for you,

8    sir.   Yes, I do believe that there are

9    scholars that believe that.   I also

10   believe that there are people who think

11   that the earth is flat, and that it's

12   6,000 years old.

13   Q.    But my question to you is not that.

14   My follow-up question was do you disagree

15   with those scholars?   And you said yes,

16   you disagreed.   And I asked you why and

17   you said that was just your belief.   And

18   I asked you, this is the question you did

19   not answer, the question is, do you have

20   anything to point to, other than your

21   personal belief, to support your position

22   that is in contrary to those experts?

23   A.    The Treaty of Tripoli.

24   Q.    Okay.   Explain that.

25   A.    Excuse me?

103

1    Q.       Explain it.

2    A.       I don't need to explain it.  You

3    can reference it.  That is my answer.

4    Q.       This is a deposition.  I can ask

5    you what I wish.

6    A.       Okay.  All right.  Well, then he

7    would have said --- I believe it was

8    Jefferson who said that this is not a

9    Christian nation by any means, and I'm

10   paraphrasing.

11   Q.       So on that basis, you believe that

12   the scholars are wrong?

13   A.       That and also the Constitution.

14   Yes, I believe you're wrong and those

15   scholars are wrong.  We were set up with

16   our Constitution to be a secular

17   government.  So no, I believe that those

18   scholars are wrong, that we are not ---

19   that our laws are not built on the Ten

20   Commandments, and that this is not a

21   Christian nation.

22   Q.       And you base that off of your

23   reading of the Constitution and what ---

24   your reading of what Jefferson said?

25   A.       Correct.  At least.

132

```
1                    21 marked for

2                    identification.)

3    BY ATTORNEY SANCHEZ:

4    Q.      Have you seen this document before

5    that's marked as 21?

6    A.      No.

7    Q.      Okay.  Are you a member of the

8    Freedom From Religion organization?

9    A.      Yes.

10   Q.      And was the membership provided for

11   you as a gift?

12   A.      Yes.

13   Q.      And you don't pay anything for the

14   membership?

15   A.      No, not currently.

16   Q.      And how long are you a member for?

17   A.      This year.

18   Q.      Okay.  Is that all?

19   A.      Yes, I believe my membership

20   expires in 2015.

21   Q.      Were you provided that membership

22   for participating in this lawsuit?

23   A.      No, not that I know of.

24   Q.      Not that you know of?

25   A.      Nope.
```

145

1    Q.      And that's been waived for you?

2    A.      Different people have gifted it to

3    me, yes.

4    Q.      Who gifted it to you?

5    A.      I'm not aware.

6    Q.      You're not aware who gifted it to

7    you?

8    A.      Nope.

9    Q.      All right.

10   A.      I see from your exhibit whatever

11   that apparently Dan Barker did it for

12   this past year but nope, I was never made

13   aware of that.

14   Q.      Who is Dan Barker?

15   A.      I believe he's the co-president of

16   FFRF.

17   Q.      Okay.  Then it's your testimony

18   that has nothing to do with you being a

19   Plaintiff in this case?

20   A.      Correct.

21   Q.      All right.  Let's go to some basic

22   stuff.  Where do you reside?

23   A.                         , Arnold, PA,

24   15068.

25   Q.      How long have you resided there?

167

1    information in the fields provided.

2    Q.      Sure.

3    A.      And gave a brief description of

4    what I was complaining about.

5    Q.      Okay.  How did you come to know of

6    the existence of Freedom From Religion

7    Foundation?

8    A.      I heard it on the news.

9    Q.      You heard it on the news?

10   A.      Yeah.

11   Q.      What did you hear on the news?

12   A.      That FFRF sent a letter complaining

13   about the monument.

14   Q.      Was that the Connellsville

15   incident, ---

16   A.      I don't think so.

17   Q.      --- do you know?

18   A.      I don't think it was that one, no.

19   Q.      Okay.  I guess that's a good

20   follow-up question.  Do you remember what

21   entity was involved?  Was it a

22   municipality, a School District, what?

23   A.      It was Valley School District

24   because that's why my ears perked up was

25   that I heard that they sent a letter

168

1    regarding the monument at the high

2    school.

3    Q.      Oh, okay.  I get it.  So you had

4    heard that a letter was sent from the

5    Freedom From Religion Foundation to the

6    --- to the New Ken School District, ---

7    A.      Right.

8    Q.      --- regarding that specific

9    monument?

10   A.      Yes, I heard about it in the news.

11   Q.      Okay.  About when was that, do you

12   know?

13   A.      No, I don't.

14   Q.      Was it 2012?

15   A.      When the first letter was sent?

16   Q.      Yeah.

17   A.      I don't know.

18   Q.      Well, just when you became aware of

19   it is what I'm asking.  I'm not worried

20   about the letter or what ---.  When you

21   heard this media report.

22   A.      Yeah.  I don't know whenever the

23   letter --- the first letter was dated,

24   but it was after I heard about it.

25   Q.      Okay.