# EXHIBIT I



# DEDICATION PROGRAM

NEW KENSINGTON HIGH SCHOOL
New Kensington, Pennsylvania

**Monday, November 18, 1957**

**7:45 P.M.**

NewKen-Arnold 00149



# NEW KENSINGTON SCHOOL BOARD

Top left — Blair Gensamer, President, Garfield Jones, Treasurer, and Charles Keller, Vice President, studying finances

Top right — Dr. Carl Vonderheid and James Patterson, Jr. selecting office equipment

Center — Superintendent William Jefferson, Veronica Mazur, Secretary, and Ralph Little, Jr. studying blueprints

Inset — Charles Vaughan, Jr.

# NEW KENSINGTON SCHOOL DISTRICT BUILDING AUTHORITY

Dr. Howard Dunhoff, Chairman, Walter Weber, Vice Chairman, checking bond issue bids

Edward Wanderer, Treasurer, Anthony Giordano, Secretary, and Charles Booth, Jr., Assistant Sec.-Treas., selecting school furniture

NewKen-Arnold 00150

# DEDICATION PROGRAM

William L. Jefferson, Superintendent of Schools, Presiding

Band Concert (7:45-8:00 P.M.) ....................................... Senior High School Band

National Anthem ....................................... Senior High School Band
"The Audience"

Invocation ....................................... Rabbi Herbert Panitch
Beth Jacob Congregation

Special Music ....................................... Senior High School Choir
"Elijah Rock"—Spiritual
"My Fair Lady" Selections—Lerner & Loewe

Introduction of School Board Members

Introduction of School District Authority Members

Introduction of Guests

Presentation of Key to Building ....................................... Mr. John Hunter, Architect
Hunter, Campbell & Rea

Acceptance of Building

    For the Authority ....................................... Dr. H. J. Dunhoff, President
New Kensington School District Authority

    For the School Board ....................................... Blair E. Gensamer, President
Board of Education

    For the School ....................................... Frank G. Oliver, Principal
Senior High School

    For the Students ....................................... Lester Smith, President
Student Council

Prayer ....................................... Rev. Geo. J. Baisler
Pastor of the First Lutheran Church

Dedicatory Address ....................................... Dr. Edward H. Litchfield
Chancellor, University of Pittsburgh

America the Beautiful ....................................... Senior High School Band
"The Audience"

Benediction ....................................... Rev. Father Thomas Rinn
St. Joseph's R. C. Church

Open House Following the Program



NewKen-Arnold 00151



**Superintendent**
W. L. JEFFERSON

# ADMINISTRATION

Superintendent of Schools _____ William L. Jefferson

High School Principal _____ Frank G. Oliver

Elementary Supervisor _____ O. W. Johnson

Vocational Director _____ Saul Danovitz

Ridge Avenue Junior High School Principal _____ Walter W. Mooney

Main Street Junior High School Principal _____ George Veitch

Dean of Girls _____ Lucretia Boucher



**Principal**
FRANK G. OLIVER

NewKen-Arnold 00152

# THE TEACHING STAFF

| Name | Subject |
|---|---|
| Apel, J. Dale | Chemistry |
| Armstrong, John | Bookkeeping |
| Babalis, Gust | German, English |
| Batiste, John | Shorthand, Typing |
| Baughman, Maud | History |
| Braunger, Thomas | Industrial Arts |
| Bruno, Carolyn | Music, Choir |
| Burnett, Thomas | History |
| Casillo, Catherine | Shorthand, Typing |
| Crosby, Ruth | Commercial Geography, Cons. Ed., Salesmanship |
| Della, Jean | Business Math., Rapid Cal., Retail Training |
| Dunn, T. A. | Health |
| Eiges, Dorothy | Guidance, History |
| Ewing, Florence | Librarian |
| Fields, Ruth | School Nurse |
| Fitzmaurice, Vincent | Math., History |
| Fletcher, Don | Algebra, General Math., History |
| Frazier, Matthew | Patternmaking |
| Fry, Gertrude | Art |
| George, John | English, Spanish |
| Gosetti, Mary | Spanish |
| Greiner, Theodore | Physical Education |
| Griesemer, Ruth | English |
| Herceg, John | Advanced Algebra, Plane Geometry |
| Hobaugh, Mary Ann | Health, History |
| Hood, Catherine | English, Latin |
| Kelser, John | Guidance |
| Klinke, Alice | Public Speaking, English, Dramatics |

| Name | Subject |
|---|---|
| Kordes, C. M. | Typing, Bookkeeping, Algebra |
| Malyn, Milton | Distributive Education |
| Mathison, Janet | Biology |
| Matisko, John | Biology |
| McDonald, George | Drafting |
| Moore, Jessie | History, P. O. D. |
| Nalbach, Henry | Electricity |
| Olmer, Genevieve | Clothing |
| Pandolph, Eugene | Machine Shop |
| Pascaretta, Rosemarie | Physical Education |
| Patterson, LaRue | French, English |
| Potter, Margaret | Foods |
| Roberts, Florence | Geography of Americas, Global Geography |
| Rorabaugh, Alice | Latin |
| Russell, Martha | English, Journalism |
| Shearer, Walter | English, History |
| Slosky, Kenneth | Driver Education |
| Stephens, John | Band Director |
| Taylor, Jane | English |
| Terwilliger, Helen | English |
| Thompson, Elizabeth | Plane Geometry |
| Upton, Fred | Drafting, Theory |
| Vorlage, Ethel | Shorthand, Typing |
| Vorlage, W. L. | Business Machines, Commercial Law |
| Walker, Marie | Advanced Algebra, Solid Geometry, Trigonometry |
| Walter, C. H. | Chemistry, Physics |
| Warner, R. F. | Math., Science, Theory |
| White, Thomas | Machine Shop |

# THE CLERICAL STAFF

**School District**

Norma Warsing
Doris Moskalsky
Louise Bayle

**High School**

Mathilda Milauskas
Christine Antonacci
Janet Olson



NewKen-Arnold 00153



# BUILDING DATA

| | |
|---|---|
| Site | 30 acres |
| Classrooms—Standard | 16 |
| Oversize | 5 |
| Science—Biology | 2 |
| Physics | 1 |
| Chemistry | 1 |
| Chemistry Lecture | 1 |
| Commercial Rooms | 6 |
| Distributive Education | 1 |
| Homemaking Suite | 1 |
| Art and Craft | 1 |
| Music—Band and Choir | 1 |
| Practice Rooms | 3 |
| Office | 1 |
| Library and Conference Room | 1 |
| Study Hall Rooms | 2 |
| Student Activities Room | 1 |

| | |
|---|---|
| Vocational Department: | |
| Industrial Arts | 1 |
| Machine Shop | 2 |
| Patternmaking | 1 |
| Electricity | 1 |
| Drafting | 1 |
| Planning Room | 1 |
| Conference Rooms | 3 |
| Cafeteria (seats 450) | 1 |
| Auditorium (seats 1322) | 1 |
| Administration Suite | 1 |
| Faculty Rooms | 2 |
| Health Suite | 1 |
| Gymnasium (seats 2000) | 1 |
| Locker Rooms | 2 |
| Storage Rooms | 12 |

NewKen-Arnold 00154

# PROGRAM OF STUDIES

New Kensington, primarily an industrial and commercial city, draws its students not only from the city proper but from the surrounding area. Its racial, lingual, economic and cultural backgrounds are highly heterogeneous. The variety of subject offerings included in the Senior High School curriculum enables students to select a curriculum to satisfy their various needs, abilities and interests. No longer are the high school courses planned primarily for those who expect to attend college, but they are designed to prepare also the students who go directly into some gainful occupation from high school.

College Preparatory
General Education
Commercial Secretarial
Commercial Clerical
Commercial Bookkeeping
Distributive Education
Vocational Machine Shop
Vocational Patternmaking
Vocational Drafting
Vocational Electrical



NewKen-Arnold 00155

# HISTORY

In May 1899, approximately twenty-five boys and girls completed subjects prescribed for the last year's course of New Kensington Public Schools. The Board of Directors, believing that some provisions for additional schooling should be made for these boys and girls, recommended that a three year high school be offered. Later this was changed to a two year course. When school opened in September of 1899, sixteen boys and girls reported to the Walnut Street building to begin their high school work.

When school opened in September of 1900 just three boys and three girls of the original group returned to continue their high school work. The seniors, as they were now known, were all planning to go to college. In 1905 the high school became a four year high school. A class of four graduated in 1909 to be the first four year class. Over ten thousand proud and eager students have been graduated from New Kensington High School, including the Class of 1957.

From this early beginning the people of New Kensington have supported improvements in the public schools and rapid progress has been noted down through the years. The new New Kensington High School is a result of the same kind of interest and cooperation that was displayed by those progressive-minded citizens who started the high school curriculum in 1899.



NewKen-Arnold 00156

# IMPORTANT DATES

Architects Employed ————————————————————— April 19, 1954

Opening of Bids on Construction ————————————— May 4, 1955

Ground Breaking ———————————————————————— July 6, 1955

Construction Began ———————————————————————— July 10, 1955

Cornerstone Placing ———————————————————— July 16, 1956

Opening of Bids on Furniture and Equipment ——————— Feb. 18, 1957

Building Occupied ———————————————————————— Sept. 3, 1957

Open House ————————————————————————————— Sept. 15, 1957

Dedication ——————————————————————————————— Nov. 18, 1957



NewKen-Arnold 00157

# FINANCIAL DATA

**Architect**

Hunter, Campbell & Rhea
Altoona, Pennsylvania

**Resident Architect**

Harold Schwartz

**Construction Costs:**

General contract—Branna Construction Co., Inc., Pgh., Pa. ........$1,867,490.13
Heating and ventilating—E. M. Cole, Farrell, Pa. .................... 221,992.00
Plumbing construction—Butler Plbg. & Htg. Supply, Inc., Butler, Pa. 184,421.37
Electrical construction—Moyer Bros., Altoona, Pa. .................... 233,277.03

Total cost of construction ..................................................$2,507,180.53

Cost of site .................................................................... 25,000.00

Test borings, surveys .......................................................... 2,272.13

*When the cost of the following items are determined the total
cost of the project will be approximately $3,000,000.00:

| | |
|---|---|
| Equipment | Trustees fees |
| Architect's fees | Printing |
| Bond counsel | Authority expenses |
| Local legal counsel | |

No. of square feet ............................................................ 133,677

Approximate cost per square foot ....................................... $18.75

No. of cubic feet .............................................................. 2,459,000

Approximate cost per cubic foot ......................................... $1.02

No. of pupils .................................................................... 1,000

Rooms cabled for television.

Organ tone chambers in auditorium.

Classrooms are four different sizes and tailored to fit the subject taught.

Storage shelves, built in file cabinets and cupboard in each classroom.

Individual student lockers.

Modern kitchen facilities.

Automatic gym divider door—boys and girls gym classes can be held at the
same time.

Public address system (two way) reaching all rooms.

Length of building—Approximately 875 ft.

Size of site—Approximately 25 acres.

Total size of School District property including stadium, practice fields and parking
lot—Approximately 50 acres.

NewKen-Arnold 00158



# NEW KENSINGTON
# BUILDING AUTHORITY

Authority members are appointed by the school board for terms of from one to five years. After their terms expire they can be appointed for five year terms. An appointment is open yearly.

The Authority met with the representative of the architects, George Walker, at the contractor's conference each Thursday at the construction site. Harold Schwartz, local architect, also attended these conferences.

Authority meetings averaged three or four meetings a month since terms of the members were established on January 1, 1953.

NewKen-Arnold 00159

# NEW KENSING·

## NEW KENSING·



**FIRST  FLOOR  PLAN**



**SECOND  FLOOR  PLAN**

NewKen-Arnold 00160

# N HIGH SCHOOL

**PENNSYLVANIA**



NewKen-Arnold 00161



## SECTION

Entrance to the lobby of the high school auditorium



The cafeteria kitchen just before a lunch period



Rear view of the high school auditorium

NewKen-Arnold 00162

# EXHIBIT K

```
 1          THE UNITED STATES DISTRICT COURT FOR THE

 2            WESTERN DISTRICT OF PENNSYLVANIA

 3         ------------------------------------------

 4      FREEDOM FROM RELIGION FOUNDATION, INC., DOE 1,
        by DOE 1's next friend and parent, MARIE
 5      SCHAUB, who also sues on her own behalf, DOE
        2, by DOE 2's next friend and parent DOE 3,
 6      who also sues on DOE 3's own behalf,

 7            Plaintiffs,

 8       -vs-

 9      NEW KENSINGTON-ARNOD SCHOOL DISTRICT,

10            Defendant.
        ------------------------------------------
11         Examination Before Trial of GEORGE

12      BATTERSON, held before Brittany M. Whelan,

13      Notary Public, at 170 Franklin Street, Suite

14      601, Buffalo, New York, on May 6, 2014 at

15      10:00 AM, pursuant to notice.

16
        APPEARANCES:   STEELE SCHNEIDER
17                     BY: MARCUS B. SCHNEIDER, ESQ.,
                       428 Forbes Avenue, Suite 700
18                     Pittsburgh, Pennsylvania 15219
                       (412) 235-7682
19                     Marcschneider@steeleschneider.com
                       Attorneys for the Marie Schaub
20                     and Doe 1

21                     ANDREWS AND PRICE
                       BY: ANTHONY SANCHEZ, ESQ.,
22                     1500 Ardmore Blvd., Suite506
                       Pittsburgh, Pennsylvania 15221
23                     (412) 243-9700
                       Attorneys for the Defendant
```

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1      A. Five years.

2      Q. Okay.  And that would be from 2007 to 2012?

3      A. Yes.

4      Q. Okay.  And with respect to your religious

5         views during your tenure at the District,

6         would you say that you would have considered

7         yourself a Christian throughout your time

8         there?

9      A. Yes.

10     Q. And with respect to any particular

11        denomination, any shifts or changes during

12        that time?

13     A. No.  At the time I attended the Episcopal

14        Church occasionally in New Kensington, but

15        actually I didn't go to church that much when

16        I was superintendent there.  Since I came back

17        here to Buffalo I've been going to a Christian

18        Church every Sunday up here in Buffalo.

19     Q. Okay.  I just want to try to get an idea

20        whether I'm going to need to specify in a

21        certain time period when I'm asking questions

22        whether your views have changed.  We'll just

23        deal with that as we go along.

──────── GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14 ────────

 1    A. Okay.

 2    Q. Now, would it be fair to say that you are

 3       familiar as a Christian with the Ten

 4       Commandments?

 5    A. Yes.

 6    Q. What do you understand the Ten Commandments to

 7       be?

 8    A. They're rules that people should follow in

 9       their lives.  I believe whether they're

10       Christian or non-Christian it would be good to

11       abide by those rules.

12    Q. Okay.  Do you have any understanding as to the

13       origin of the Ten Commandments?

14    A. Yes.

15    Q. What do you understand that to be?

16    A. Well, I learned that when Moses climbed the

17       top of Mt. Sinai, God told him the

18       Commandments which he wrote on a tablet and

19       then brought down to the people of Israel.

20       And since then --

21    Q. So would you agree with me that Christianity

22       takes the position that the Ten Commandments

23       represent the word of God?

─────── **DEPAOLO-CROSBY REPORTING SERVICES, INC.** ───────
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

```
 1    A. Yeah.  I would say that's true from the Bible

 2       and also the Jewish religion; both

 3       Christianity and Jewish religion.

 4    Q. Sure.  And you indicated that your belief is

 5       that the Ten Commandments is good to live by

 6       regardless of whether one is religious?

 7    A. Yes.

 8    Q. For you personally, do you endeavor to live by

 9       the Ten Commandments?

10    A. I try to as much as I can.

11    Q. And you indicated you're able to sort of see

12       how a non-religious individual should be

13       motivated to follow the Ten Commandments just

14       as a religious person would be.  Would your

15       personal belief --

16            MR. SANCHEZ:  I'm going to object to

17       form.  I don't think he said that.

18            MR. SCHNEIDER:  Okay.  Let me back up.

19    Q. Do you believe that the Ten Commandments

20       represent the word of God?

21    A. I believe they do.

22    Q. Okay.  And I believe that I saw a couple of

23       emails you were communicating with, I believe
```

1              some former students, and had indicated that

2              you would say a little prayer when you walked

3              by the Ten Commandments monument at the high

4              school whenever you were present; does that

5              ring a bell?

6         A.   It's true.  I did write that to a couple of

7              students in emails.  And yes, because I was

8              walking around the high school frequently and

9              often going to sports events especially, we

10             would talk by the Ten Commandments.  They're

11             actually not at the main entranceway.  They're

12             at kind of a sports entranceway.  But when I

13             walked by them sometimes I would say a silent

14             prayer.

15        Q.   Okay.  And you sort of anticipated perhaps,

16             one of my questions was whenever you were

17             moved to pray at the Ten Commandments, was it

18             a silent practice or was it not silent?

19        A.   It was silent.  No one would ever know I was

20             praying.

21        Q.   Okay.  And now do you recall there being

22             anywhere else on the Valley High School

23             grounds other than at the Ten Commandments

1        monument where you were moved to prayer?

2    A.  Well, no.  There's nothing like the monument

3        that is there or anything, but I pray all the

4        time actually.  Especially when I was the

5        school superintendant.  I used to ask God to

6        try to help me to help the children.  I

7        actually do a lot of silent prayers during the

8        day.

9    Q.  Okay.  But I think the first part of your

10       answer you said there's really no other

11       structures on the school ground that moved you

12       to prayer?

13   A.  Right.

14   Q.  Okay.  And now, at some point you received a

15       letter from the Freedom From Religion

16       Foundation requesting that the monument at the

17       school be removed; do you recall that?

18   A.  Yes.

19   Q.  And would it be fair to say that you saw that

20       as an opportunity to sort of affirm the word

21       of God?

22   A.  No.  I don't believe so.  I did receive the

23       letter and I took the letter to my Board of

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1          School Directors in executive session and had
2          them read it.  What happened -- I guess I'll
3          tell you about it.  I received the letter and
4          I took it to executive session at the Board
5          meeting.  I read the letter to the Board of
6          School Directors.  I didn't even say a word.
7          I just read them the letter and said we
8          received this and you should be aware of it.
9          After I finished speaking and reading the
10         letter, all of the Board Members, all nine of
11         them said that I should consult with legal
12         counsel about this because they wanted to keep
13         the monument on the front lawn of the high
14         school.
15    Q.   Okay.  And do you recall if one of your
16         solicitors or other legal counsel was present
17         during that meeting?
18    A.   I believe Tony Vigilante [phonetic] was
19         present because he was always in our executive
20         sessions.
21    Q.   Okay.  And so you referenced the Board, and I
22         think I have the name of the Board Members at
23         that time and if I could just run through them

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1          to make sure it sounds right and I know it may

2          be asking you to remember a lot but maybe you

3          do know.  At that time was Robert Pallone the

4          president of the Board?

5     A.  Yes.

6     Q.  And do you recall, Dr. Batterson, a gentleman

7          by the name Jason Fularz being the vice

8          president of the Board?

9     A.  At that time I don't think Jason was on the

10         Board when we first received the letter but

11         I'm not positive.  You'd have to look back on

12         the date of the letter.

13    Q.  Okay.  I can check that.  Do you recall Regina

14         Namey being on the Board at that time?

15    A.  It's the same answer.  I don't know whether

16         Regina was on when we received the letter.

17         She's a new member and so is Jason.

18    Q.  Okay.  Since I can verify that, let me just

19         ask you this, and you may have already said

20         this in your earlier response, were there any

21         of the Board Members, whenever you initially

22         presented them with this letter, that sided

23         with removing the monument?

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1      A.  No.

2      Q.  Okay.  And --

3              MR. SANCHEZ:  We have a solicitor

4          present and a lot of this is attorney/client

5          privilege.  If Tony Vigilante [phonetic] was

6          present, I don't think you can go to this,

7          George.  This is attorney/client privilege.

8          This is executive session, I presume.

9              THE WITNESS:  Yes.

10     Q.  Okay.  We'll move on from the executive

11         session.  I guess what I wanted to ask you is

12         I believe -- and I believe Brittany has a copy

13         of the letter if you would need to see it, I

14         believe the letter that you received was sent

15         -- you received it on a Wednesday, I believe

16         and that was March 21st?

17             MR. SANCHEZ:  George, I'd instruct you

18         to get the letter in front of you and read it.

19     Q.  Dr. Batterson, do you recognize this letter?

20     A.  Yes.

21     Q.  Would this be the letter that we had discussed

22         previously that you presented to the Board in

23         executive session?

1    A. Yes.

2    Q. Okay.  And I believe the date on the letter is

3       March 20th?

4    A. Yeah.  March 20th, 2012.

5    Q. Okay.  I believe that there's materials in

6       discovery that indicate you received it on the

7       21st.  Obviously you wouldn't have received it

8       the same day it was sent if it was sent from

9       Wisconsin.  But do you recall receiving it

10      shortly after it was dated?

11   A. Yes.

12   Q. Okay.  And I believe that -- do you know when

13      -- is there a consistent scheduling of Board

14      meetings at New Kensington-Arnold or was there

15      when you were a superintendant there?

16   A. Yes.

17   Q. And do you recall when those Board meetings

18      were held?

19   A. We met twice a month.  I think it was the

20      second and fourth Wednesday.  I'm not

21      positive.

22   Q. Okay.  So I think that there's some materials

23      in a news report that talk about a private

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1              session before a Board meeting on March 22nd,

2              which I believe would be a Thursday.  But do

3              you recall shortly after receiving this letter

4              having the opportunity to present it to the

5              Board?

6         A. Yes.  Soon after I received the letter.  I

7              would have done it at the Board meeting after

8              receiving the letter.

9         Q. Okay.  And prior to that Board meeting, did

10             you discuss the letter with anyone else?

11        A. Well, my secretary that got the letter.  I

12             actually am not really sure about that.  I

13             don't know if I discussed it with anyone else.

14        Q. Okay.  Now when you received this letter, I

15             assume that you knew the monument that was

16             being referred to?  You knew specifically what

17             monument was being referenced, correct?

18        A. Yes.

19        Q. So you were familiar with the Ten Commandments

20             monument on the District property prior to

21             receiving the letter?

22        A. Yes.

23        Q. Do you recall when you first took note of the

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1    A. Yes.

2    Q. Okay.  And when you first saw the monument,

3       you said you were entering the entrance which

4       you described earlier as being sporting

5       events, I believe, type of entrance at the

6       District, correct?

7    A. Yes.

8    Q. Okay.  And would you have been walking on one

9       of the foot paths that crosses the -- I'm not

10       sure exactly what that bridge spans, but one

11       of those foot paths that's part of the bridges

12       there?

13    A. Yes, I did.

14    Q. So when I say that you know where I'm

15       referring to?

16    A. Yes, I do.

17    Q. Okay.  And when you first noticed it, do you

18       recall whether you were able to read what was

19       on the monument?

20          MR. SANCHEZ:  You have to establish a

21       foundation.  He's walking on the pathway.  I

22       mean, you got to establish where, when, et

23       cetera.

GEORGE BATTERSON -- BY MR. SCHNEIDER -- 5/6/14

1      out your time there extends, when was your

2      last day?

3   A. It was June 30th, 2012.

4   Q. Okay.  From the date that the decision was

5      made, again, the decision to not remove the

6      monument through the expiration of your

7      contract on June 30th, 2012, do you recall

8      there ever being a change of position on the

9      issue?

10  A. No.

11         MR. SANCHEZ:  The issue being retention

12     of the monument at it's present site?

13         MR. SCHNEIDER:  I believe.  I honestly

14     lost track of the question.

15  Q. Now there were a couple of news articles where

16     you referenced receiving, I believe it might

17     have been thousands of calls or contacts

18     supporting the decision; is that fair?

19  A. Yes.

20  Q. Okay.  Do you recall there being -- some of

21     that contact being through completion of an

22     online petition regarding the keeping of the

23     monument?

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1        you that there are dozens if not hundreds of

2        these emails that look just like this and I

3        think this is automatically generated.  If you

4        look at the bottom I think there is an online

5        petition that generates these automatically.

6        My question relates to the to field of this

7        email at the top.  There's an email address

8        there that's petition@nkasd.com.

9    A.  Right.

10   Q.  Do you recall whether your email -- well, did

11       you have an email address when you were at New

12       Kensington?

13   A.  Yes.

14   Q.  Do you recall whether it ended @nkasd.com?

15   A.  I'm actually not sure.  I think it was

16       gbatterson@nkasd.com, I think.

17   Q.  Okay.  And I don't know whether it is

18       something you would have been involved in, but

19       do you know who at the District had the

20       capability of creating the District email

21       addresses?

22   A.  Only our technology director, I think.

23   Q.  Okay.  Do you recall being involved in any

1        petition, we would have reprimanded that.

2    Q.  Why is that?

3    A.  Because we should not be doing that.  We're

4        not trying to instill religious beliefs in our

5        students, we're just trying to educate them.

6        The controversy over the Ten Commandments

7        should be handled by our legal counsel.

8        There's no way we should be trying to go out

9        and get support, you know, actively getting

10       support for the Ten Commandments.

11   Q.  Okay.  Well -- so as you read through this

12       P-2, do you find it to be that the statement

13       contained in there to be inconsistent with

14       what you understood the District's position on

15       the issue to be?

16   A.  The District's position on the issue was that

17       it's a historical landmark and -- let me just

18       read this again.

19   Q.  Sure.

20   A.  After sincerely it says I'm signing this

21       because of the historical significance, that's

22       good; we would agree with that.  But then it

23       goes on to say I want to clarify that the Ten

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1    A. Yes.

2    Q. And Shawn Sperl?

3    A. Yes.

4    Q. And who is Shawn?

5    A. He's the Director of Special Education.

6    Q. Okay.  If you could take a look at the first

7       page of the Exhibit which is numbers

8       NewKen-Arnold 01092 at the bottom right.  I'd

9       call your attention to the second email here

10      which is I believe sent by you.  It starts out

11      hi everyone; do you see that?

12   A. Yes.

13   Q. Okay.  The last sentence in that email

14      indicates -- you say I use the script I

15      prepared after talking to Ray and Tony.  And

16      this is, I believe, in reference to talking

17      with Channel 11; is that right?

18   A. Yes.

19   Q. Okay.  Do you recall when you would have

20      developed or prepared whatever the script is

21      that you were referencing?

22   A. I'm not exactly sure.  It must have been soon

23      after the Board meeting because that's when

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

1          the Board directed me to keep the Ten
2          Commandments and consult with legal counsel.
3          So then when I was talking to Ray and Tony,
4          I'm sure that's when they immediately -- we
5          probably figured I was going to get
6          interviewed and so I'm sure they prepared the
7          script for me really quickly.
8    Q.  Okay.  And do you recall what you would have
9          said to the press in the interview being
10         referenced here?
11   A.  No, not really.  It's been a couple of years,
12         you know, but I had the script.  Basically it
13         was saying that it was a historical monument
14         and that we were not imposing religious
15         beliefs on our students.
16              MR. SANCHEZ:  For the record, can we
17         document who Tony and Ray are?
18              MR. SCHNEIDER:  Sure.  Thanks Tony.
19   A.  So it's Tony Vigilante [phonetic] and Ray
20         Sacculo [phonetic].  They're two of our school
21         attorneys.
22   Q.  Great.  Thank you.  Now do you recall whether
23         -- as you recall in your interactions with the

1         Let me ask you some background questions.  Do

2         you recall something referred to as a clergy

3         luncheon?

4    A. Yes.

5    Q. What was the clergy luncheon?  Was that a

6         regular event?

7    A. I held about four of them every school year.

8         I invited the local clergy to come eat lunch

9         with myself and my administrators.

10   Q. Where did that take place?

11   A. It took place in Valley High School, in our

12        conference room.

13   Q. And when did you start that practice?

14   A. I started it the first year that I was there,

15        2007.

16   Q. And what were some of the things that would be

17        -- well, what occurred at the luncheon?

18   A. Well, first of all the purpose of the luncheon

19        was for me and my administrators to have

20        personal relationships with our clergy members

21        so that we could get to know them better and

22        with the thought that should we have any kinds

23        of issues that occurred in the District, like

1          a couple of our students died during my tenure

2          there.  So when that occurred, we called on

3          the clergy to assist with us with their

4          grieving families and their churches.  Also, I

5          used it as an opportunity for me to be able to

6          present our school budget to the ministers and

7          explain issues that we had in finances in

8          hopes that they would support the school

9          budget when they had their congregations in

10          their church if they were asked questions that

11          they would encourage people to vote for the

12          budget.  Then the last thing is I used some of

13          our students to do presentations to the clergy

14          members about programs that we were doing in

15          our school.

16     Q.  Were there similar luncheons that you had with

17          any other groups of individuals?

18     A.  I had -- yes.  But the clergy luncheon was

19          about four times a year.  I had quite a few

20          luncheons.  I had luncheons once a month with

21          curriculum counsel members which is my

22          teachers and administrators and that was to

23          just eat lunch and be able to have a nice

GEORGE BATTERSON  --  BY MR. SCHNEIDER  --  5/6/14

 1        you hope that the monument stays and my

 2        question was whether that was motivated at all

 3        by your personal religious views?

 4     A. I think that my personal religious views,

 5        because they're strong, my personal views were

 6        that I would have liked to keep the monument

 7        there, right.

 8     Q. Okay.  I'm going to ask Brittany to provide

 9        you with a document that's been marked as

10        P-15.  On the bottom right is NewKen-Arnold

11        01095.

12

13            (A recess was then taken.)

14

15     A. Okay.  I read it.

16     Q. Okay.  Does this document look like another

17        email that would have been sent by you?

18     A. Yes.

19     Q. Okay.  And the recipient again is Andrea; is

20        that right?

21     A. Yes.

22     Q. Okay.  In the last sentence of the second

23        paragraph of your email, you indicate that I'm

1      happy I'm in a position to do what is right

2      for all of the Christians and my students?

3  A. Yes.

4  Q. What is it that you felt you could do that

5      would be right for all of the Christians?

6  A. Well, remember this is my finance I'm writing

7      to so this is something I wouldn't have

8      written to someone in my staff.  But the

9      question was how did I think I was helping

10     Christians?  I think that because my Board of

11     School Directors directed me to keep the

12     monument on the front lawn of the high school,

13     that in addition to that, you know, I have the

14     strong religious beliefs because I'm always

15     praying about everything that I thought I was

16     doing the right thing in terms of being a good

17     Christian.

18  Q. Okay.  With resect to your statement with

19     regard to your students, why did you feel that

20     position would be right for the students?

21  A. I guess -- you know, when I wrote it it was

22     like a year or two years ago.  But I think I

23     probably was just thinking that it was

# EXHIBIT L

1

1

2          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3
                  - - - - -

4
        FREEDOM FROM RELIGION   )
5       FOUNDATION, INC., DOE 1)
        by DOE 1's next friend )
6       and parent, MARIE      )
        SCHAUB, who also sues  )
7       on her own behalf,     )
        DOE 2, by DOE 2's next )
8       friend and parent,     )
        DOE 3, who also sues on)
9       DOE 3's own behalf,    )
                               )
10              Plaintiffs,    )
                               )
11              vs.            ) Civil Action
                               ) No. 12-1319
12      NEW KENSINGTON-ARNOLD  )
        SCHOOL DISTRICT,       )
13                             )
                Defendant.     )
14
                  - - - - -

15
        DEPOSITION OF SUPERINTENDENT JOHN PALLONE

16
                  - - - - -

17
                April 14, 2014

18
                  - - - - -

19

20

21             ORIGINAL

22

23      REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
        WITHOUT AUTHORIZATION FROM THE CERTIFYING
24      AGENCY

25                - - - - -

1    Superintendent Pallone - by Mr. Schneider

2    believe.

3        Q.    Prior to that, were you located

4    within the New Kensington-Arnold community?

5        A.    Yes.

6        Q.    How long have you been within the

7    New Kensington-Arnold School District with your

8    personal home address?

9        A.    Let's see.  53 years and 8 months.

10       Q.    I guess then your whole life?

11       A.    Yes.

12       Q.    Does that mean that you attended

13   elementary school as well as high school in the

14   New Kensington-Arnold School District?

15       A.    Yes.

16       Q.    At the time that you went through

17   the schools here in terms of the location of

18   the schools, what's currently the high school,

19   was that also the high school when you

20   attended?

21       A.    Yes.

22       Q.    And so you would have been in the

23   current high school for how many years of your

24   education?

25       A.    Three; 10, 11, and 12, as a student

1    Superintendent Pallone - by Mr. Schneider
2    at the high school.  I attended junior high
3    school at the Arnold Junior High, which is now
4    the Valley Middle School.  That was 7, 8, and
5    9.  Then we had a number of elementary schools
6    within the district at that time.  It was a
7    much larger district then.
8         Q.    And your tenure as superintendent of
9    this district, when did that begin?
10        A.    October 1, 2012.
11        Q.    And you have been superintendent
12   continuously since then?
13        A.    For 18 months, more or less, yes.
14        Q.    Prior to accepting that position,
15   where were you employed?
16        A.    I was employed for the law firm of
17   John E. Pallone, Attorney at Law.
18        Q.    Where were your offices located?
19        A.    In Arnold, Pennsylvania, on Fifth
20   Avenue.  And prior to that, immediately, I
21   served ten years in the General Assembly.
22        Q.    Did you attend law school before or
23   after serving the General Assembly?
24        A.    Long before.  I'm a 1988 graduate of
25   law school.

1      Superintendent Pallone - by Mr. Schneider

2   essentially the chief executive officer of the

3   district.  Would that be fair to say?

4      A.    That would be fair to say, yes.

5      Q.    So I imagine that there was a lot of

6   familiarizing yourself with the goings on in

7   the district when you first came on the scene.

8   Would that be fair to say?

9      A.    That would be fair to say, yes.

10     Q.    Do you recall -- you're familiar

11   with the lawsuit which is sort of the reason

12   we're here today; correct?

13     A.    I suppose.

14     Q.    Do you recall when you first learned

15   of the filing of the lawsuit?

16     A.    I do not.  I read it in the

17   newspaper.

18     Q.    Going back, you have been in the

19   community for your whole life.  Do you recall

20   the first time that you saw the monument that's

21   at issue in this case?

22     A.    I do not recall the first time I

23   ever saw it.  I recall the first time I ever

24   paid attention to it.

25     Q.    Okay.

1          Superintendent Pallone - by Mr. Schneider
2          A.    It was after it made the headline
3     news in the local newspaper.  It would have
4     been in the springish of 2013, I think.
5          Q.    I think it was '12, but --
6          A.    '12, okay.  Yeah, '12.  I'm a year
7     off.  You're right.
8          Q.    So that fall is when you began --
9          A.    That is when I first acknowledged
10    that it was a monument of the Ten Commandments.
11         Q.    So prior to that, the fact that it
12    had the Ten Commandments represented or -- that
13    it had -- prior to that, you weren't familiar
14    with the specific contents of the monument?
15         A.    I probably walked past that monument
16    no less than a thousand times in my life.  I
17    was a student here.  180-some school days for
18    three years.  So I walked past it every day to
19    go to school.  Never knew it was there.
20    Attended dozens and dozens and dozens beyond
21    even counting of events at this district and at
22    that building, walked past it a zillion times.
23    I don't know how many, a thousand, and never
24    even knew it was there.
25              Even as an undergraduate in the

1    Superintendent Pallone - by Mr. Schneider

2    junior high, came down and -- because I played

3    football, we came down here to lift and work

4    out and run or whatever we did.  I have been to

5    this building no less than a thousand times in

6    my life and never, ever recognized that

7    monument even being there until it was brought

8    to my attention in the newspaper that it was

9    the Ten Commandments.

10        If you would have asked me that

11   today, other than this lawsuit, I wouldn't even

12   be able to tell you what was on the monument.

13        Q.    After you did become aware of what

14   was on the monument because of the news

15   reports, was there a time after that point

16   where you sort of stopped to take a look at the

17   monument?

18        MR. SANCHEZ:  I'm going to --

19   just so I have a running objection.  I think

20   anything regarding his observations or what

21   happened subsequent to the filing of this

22   lawsuit is irrelevant.

23        But, moreover, I caution the witness

24   that any questions, any information that you

25   have that relates to meetings with counsel is

1     Superintendent Pallone - by Mr. Schneider

2     BY MR. SCHNEIDER:

3          Q.    Is it fair to say that the district

4     is opposing this lawsuit?

5                    MR. SANCHEZ:  I'm going to

6     object on vagueness.

7          A.    Yeah, that's a legal determination.

8          Q.    I'm really just looking -- I'm just

9     asking in your capacity as superintendent.  I

10    imagine that at some point in time counsel has

11    to be retained by the district in order to

12    represent the district.  Would that be fair?

13         A.    Yes, sir.

14         Q.    The lawsuit was filed in the middle

15    of September.  And that would have been after

16    -- that would have been two weeks before you

17    began as superintendent.

18                    Do you know whether that would be

19    after the board meeting where you would have

20    been chosen as the superintendent or before?

21         A.    I don't recall.  I think it was

22    before, but I'm speculating.

23         Q.    And then in February, in Answers

24    filed after some motions practice, and -- I

25    guess what I'm trying to ascertain is whether

EXHIBIT M

1

1

2         IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3
                - - - - -
4
        FREEDOM FROM RELIGION    )
5       FOUNDATION, INC., DOE 1)
        by DOE 1's next friend )
6       and parent, MARIE       )
        SCHAUB, who also sues   )
7       on her own behalf,      )
        DOE 2, by DOE 2's next )
8       friend and parent,      )
        DOE 3, who also sues on)
9       DOE 3's own behalf,     )
                                )
10              Plaintiffs,     )
                                )
11              vs.             ) Civil Action
                                ) No. 12-1319
12      NEW KENSINGTON-ARNOLD   )
        SCHOOL DISTRICT,        )
13                              )
                Defendant.      )
14
                - - - - -
15
        DEPOSITION OF ROBERT MICHAEL PALLONE, SR.
16
                - - - - -
17
                April 14, 2014
18
                - - - - -
19

20
            ORIGINAL
21

22

23      REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
        WITHOUT AUTHORIZATION FROM THE CERTIFYING
24      AGENCY

25              - - - - -

8

1              R. Pallone - by Mr. Schneider

2     Saltsburg, Pennsylvania, otherwise known as

3     Kiski Prep.  I attended Valley High School up

4     until the 11th grade.

5          Q.    And, prior to that, did you attend

6     New Kensington-Arnold public schools?

7          A.    Arnold Jr. High School, which is

8     part of New Kensington, the Ray Hunt Building,

9     which is part of the New Kensington-Arnold

10    schools.  Prior to that, Greenwald Elementary.

11    Prior to that, Berkey Elementary.  I'm

12    basically here for my whole life.

13         Q.    And that's what I was trying to

14    establish.  So the years in between, that's not

15    really important.  The bulk of your life you've

16    been in this community; right?

17         A.    Right.  Probably -- I'm going to

18    say, I was probably, not counting college, I

19    was probably here 40 of my 50 years of

20    existence.

21         Q.    And the time at the high school

22    before you went to Kiski Prep, were you in what

23    is currently the high school?  The same

24    building?

25         A.    Yes.  That building has been there

18

1          R. Pallone - by Mr. Schneider

2          A.    Define "taking note."  What do you

3     mean?

4          Q.    Sure.  The first time that you read

5     the contents of the monument.

6          A.    I never read the contents of the

7     monument.

8          Q.    So do you remember the monument

9     being in its current location when you were a

10    student in high school?

11         A.    I remember there being a monument on

12    that property.  That I do remember.  My -- what

13    I always believed it was a monument to our

14    local World War II veterans or Korean War

15    veterans or something like that.  That's what I

16    thought it was.

17         Q.    So, as a student, that would have

18    been your thought, and then even after you went

19    to Kiski Prep and you moved back into the

20    community as an adult, that was your thought

21    for a long time?

22         A.    Until your objection was presented

23    to me, I had no idea that that was there and

24    never even gave it a second thought.

25         Q.    And just so we can clarify, I think

28

1          R. Pallone - by Mr. Schneider

2    to mark as Exhibit P-1.  Take a look at this

3    document and let me know whenever you've had a

4    chance to review it.  I'm going to ask you some

5    questions about it.

6                    (Pallone Exhibit No. P-1 was

7    marked for identification.)

8        A.    (Witness complying.)  I'm familiar

9    with this document.

10       Q.    What does this document represent?

11       A.    This document was a Facebook post on

12   a Facebook site that my wife brought to my

13   attention.

14       Q.    Do you recall if the site you

15   mentioned would have been the group titled,

16   "Keep the Ten Commandments at Valley High

17   School"?

18       A.    I don't recall the name of it, but

19   that sounds familiar.

20       Q.    You said your wife made you aware of

21   the existence of the site?

22       A.    Yes.

23       Q.    Can you try and place in time your

24   finding out about the letter and your wife

25   telling you about the site?

R. Pallone - by Mr. Schneider

1

2              MR. SCHNEIDER:  Sure.

3     BY MR. SCHNEIDER:

4          Q.    So in that statement, it sounds to

5     me like you're basically making a comment on

6     behalf of the community, administration, and

7     the board and their feelings about this

8     request.  Would that be fair?

9          A.    I'm saying that the feedback that I

10    received from the community, the

11    administration, and the board, was that we did

12    not agree with removing it.  That's what I

13    would say.

14         Q.    Do you recall what might have caused

15    you to say that regarding the community at the

16    time you made this post?

17         A.    People at the meeting probably

18    saying things, people at Giant Eagle when

19    you're there saying things, people at Buffalo

20    Bill's when you're there, people wherever you

21    may be publicly, yeah.

22         Q.    And this post, and we can confirm,

23    but I believe it was made on March 24 of 2012.

24    And I believe the letter was sent by Freedom

25    From Religion Foundation on March 20, 2012.

34

1          R. Pallone - by Mr. Schneider

2     Would that sound about right, three or four

3     days later you would have made this post?

4          A.    If you have a letter that says

5     March 20 and Tony agrees, then I would say that

6     would be -- you'd probably be accurate, or

7     somewhere thereof.

8          Q.    And so when you're speaking with

9     respect to the administration, do you recall

10    who you would have spoken with in the

11    administration regarding their feelings on the

12    request for removal of the monument?

13         A.    I think that all of the

14    administrators that were present when the

15    notification was made and numerous

16    administrators that made comment on the side.

17         Q.    Do you recall specifically anyone

18    that might have made comments?

19         A.    I talk to a lot of people every day.

20    I don't recall that.

21         Q.    You also mention the board here, the

22    board being outraged by the request.  Would it

23    be fair to say that that was a unanimous

24    opinion of the board?

25         A.    I can't speak for the board that it

1              R. Pallone - by Mr. Schneider

2     was unanimous or not.  We did not take a vote

3     on it.  My interpretation was the board was

4     pretty united, yeah.

5         Q.    And in the next sentence you say,

6     "We will not remove the monument without a

7     fight."

8              Who is the "we" that you're

9     referring to there?

10        A.    The school decided -- the school as

11    a group that night decided that we were going

12    to take it to a fight.

13        Q.    Would that have been in the context

14    of a public meeting or an executive session, to

15    the best you can recall?

16        A.    I don't recall.  Don't recall.  I

17    think if it was -- I'm trying to remember.  Let

18    me think here.  If it had to do with

19    litigation, it was probably executive session.

20             MR. SANCHEZ:  Just as an

21    aside, the board meeting minutes are public

22    record.  So if was a general meeting, that's

23    accessible for you.  If it's not in there, it

24    was in executive session.

25             THE WITNESS:  Yeah, and, Tony,

1           R. Pallone - by Mr. Schneider

2    by that.  It's been there for 50 years.

3           Q.    So you think that it's significant

4    regardless of the content on the monument?

5           A.    I don't believe -- and nor do I

6    believe that people that have seen the monument

7    or walked by the monument see it as a religious

8    monument.  I think that they see it as a

9    monument that has been part of the school for

10   over 50 years.

11          Q.    So that same majority of people that

12   you've encountered, do you feel like they value

13   the presence of that monument?

14          A.    I can't speak for them.  I don't

15   know.  Based on my experience of what they said

16   to me?

17          Q.    Right.

18          A.    They clearly value it, based on what

19   they said to me.

20          Q.    Would some of the people in that

21   group that value the monument, do you feel they

22   also fall in the group of people that until

23   this whole thing happened weren't really even

24   aware of what was on the monument?

25          A.    I don't know.  I didn't question

1               R. Pallone - by Mr. Schneider

2        all?

3               A.     No, I'm not familiar with it.

4               Q.     Well, do you as a board member have

5        an e-mail that ends @nkasd.com?

6               A.     I've heard that I have that, but I

7        do not access it.  I never accessed it, ever.

8        I have an understanding that that might exist,

9        but, for me, if it doesn't come to

10       unilever.com, I'm not getting it.

11              Q.     And I think I saw some e-mails where

12       -- is it Audrey Sleigh?  Is that a name you

13       know?

14              A.     Yeah.  That's the board secretary.

15              Q.     Where she maybe forwarded something

16       to you and said this came to your school

17       e-mail?

18              A.     Uh-huh.

19              Q.     Do you have occasion to e-mail

20       administrators within the district?

21              A.     Yes.

22              Q.     Do you recall off the top of your

23       head whether their e-mails are e-mails that are

24       @nkasd.com?  Does that sound right?

25              A.     With the way the computer works now,

1              R. Pallone - by Mr. Schneider

2         Q.    I'm not asking --

3                   MR. SANCHEZ:  How about this.

4    Was your brother superintendent when the board

5    decided to oppose -- to actively defend against

6    this litigation?

7                   THE WITNESS:  I don't think he

8    was.  I don't believe he was.

9                   MR. SANCHEZ:  I believe that's

10   what you wanted.

11        A.    I can't tell you that unequivocally,

12   but I don't believe he was, no.  I think we

13   were already down that road.

14   BY MR. SCHNEIDER:

15        Q.    I do want to ask you a couple other

16   things about the August letter, and I know you

17   had your own opinions about the monument

18   whenever the letter was sent in March.

19        A.    My own personal opinions.

20        Q.    Right.  As a citizen.

21        A.    Right, as a citizen.

22        Q.    Which I'm sure you had personal

23   opinions as a board member, but we didn't cover

24   those because --

25        A.    No.  I wouldn't mix that.  I

1                R. Pallone - by Mr. Schneider

2        the building, you wouldn't see it.  But then he

3        said, yeah, someone could walk up to it and

4        read it, if they had the intent to do so.  But

5        I don't think he got into the mindset of the

6        individual Plaintiffs.

7            A.    Yeah, I'm not sure what you asked

8        there.  You have to restate that.

9        BY MR. SCHNEIDER:

10           Q.    Well, you said it made you skeptical

11       about how this went down; right?

12           A.    I think I said that, yes.

13           Q.    If you could, explain what you mean

14       by that?

15           A.    In my mind, as a citizen, and I want

16       to make sure we're delineating the two now,

17       because this is very -- but as a professional

18       and a citizen, if I heard this on the street,

19       heard this story, if somebody felt concern over

20       a monument because it offended them as they

21       walked in our building or whatever, which is

22       the way I understand this to go down, I say

23       that is impossible, because they can't read it.

24       They don't know what is on it.

25                I have 50 years of experience

1                   R. Pallone - by Mr. Schneider
2      walking in and out of that building.  I
3      probably have been in and out of that building
4      through those doors -- probably nobody in town
5      goes to more sporting events through those
6      doors than me, and I've never seen what is on
7      that monument.  And someone is going to come,
8      Jane Doe 1, 2, Joe Doe, or whoever it's going
9      to be, and tell me that they were offended
10     because they read that thing?  I don't believe
11     it.  I don't believe it.  And you can't prove
12     it to me and you can't change my mind.
13          Q.     That was my initial question.  You
14     continue to have the belief that you
15     disbelieve?
16          A.     I get more steadfast on it everyday.
17     When I read your Complaint --
18                 THE WITNESS:  That's official,
19     right, that Complaint?
20                 MR. SANCHEZ:  Yeah.
21          A.     Your Complaint says that when this
22     person comes to -- or whoever these peoples are
23     -- come to our district to do business, they
24     are offended by that monument.  And I would
25     challenge you to say it is impossible for them

1              R. Pallone - by Mr. Schneider

2      to come to this building, come to this district

3      and do business and ever go near that monument.

4      She would need a telescope, because there's

5      only one entrance into the building.  Only one

6      that she can get in there to do, quote,

7      unquote, "business."  It's impossible.  So I

8      question how it went down.  And I will continue

9      to do so.

10         Q.    Now --

11         A.    So you understand, too, let me be

12     very specific on this.  I want to be specific

13     with you.

14              MR. SANCHEZ:  Use a clean

15     piece of paper.

16         A.    The way this building is designed,

17     here's (indicating) the bypass.  And you come

18     down the road in here (indicating) to a circle.

19     Our one entrance is here (indicating) into the

20     high school, right there (indicating).

21         Q.    Okay.

22         A.    I should have, actually, started

23     this over more and say right here (indicating),

24     bring the circle down here (indicating).

25              MR. SANCHEZ:  Do a new

1              R. Pallone - by Mr. Schneider

2        drawing, because I might want to make it an

3        exhibit.

4                    MR. SCHNEIDER:  I thought you

5        might.

6                    MR. SANCHEZ:  Because it's not

7        going to make any sense any other way.

8        A.    Here's (indicating) the parking lot

9        outside.  This (indicating) is the parking lot.

10       Here's (indicating) the track.

11                   From this (indicating) parking lot,

12       there are two bridges that go over the creek.

13       The monument sits in the center.

14                   MR. SANCHEZ:  Write where you

15       have the zero.

16       A.    This (indicating) is the monument.

17       When you come down around the track in this

18       (indicating) circle, the entrance into our

19       business, anywhere you would do business, is

20       over here, off this (indicating) circle that

21       comes back around and goes out.

22                   The tennis courts are right here

23       (indicating).  Tennis courts.  This parking

24       right here (indicating), you are not allowed to

25       park here.  It is lined off for the buses like

1              R. Pallone - by Mr. Schneider

2      this (indicating).  Because when the buses come

3      in, they go one, two, three, four in front of

4      each other.

5              The center of the parking lot is

6      lined off, they cannot park there (indicating).

7      The parking spaces over here (indicating) to

8      this side of it over here (indicating), are

9      student only.

10             The parking that's right here

11     (indicating), in this area right here

12     (indicating), is teacher only.  And all of the

13     guest spots are right here (indicating), or

14     they are over here (indicating), at the tennis

15     court.

16             In order for you to get from here

17     (indicating), or here (indicating), to here

18     (indicating), you would never come up here

19     (indicating), around here (indicating), down

20     here (indicating).  You wouldn't do it.  You

21     would go right to this -- there's a ramp here

22     (indicating).  This (indicating) ramp goes

23     right up to the circle, right into the

24     business.  Or you'd park here (indicating), and

25     you'd come right here (indicating), and right

1           R. Pallone - by Mr. Schneider

2     into the business.

3           So it's ludicrous, as your Complaint

4     says, that when she comes here to do business,

5     whatever Jane Doe 1, 2, 3, 4, whatever they

6     are, that they are offended because they have

7     exposure to this monument.  It is impossible.

8           If she said it's when she goes to a

9     sporting event, then I'm going to fall back on

10    Ten, Five, One.  I'm going to start there with

11    you, and I'm going to tell you that there's no

12    possible way she can read it unless she goes

13    right up on it.  So that's not going to happen.

14    And I would have to keep in mind that the only

15    thing that's here is the gymnasium, and

16    attached to the gymnasium is the pool.  Now, if

17    you know anything about winter sports, they

18    don't even begin until 6:00.  It's dark.

19           I will tell you that if they're

20    walking into this building at 6:00 to go to a

21    basketball practice or game or whatever, it is

22    dark, it is impossible for them to see that

23    monument.  And I'll stay by that.

24           So, as a result, I question how this

25    all went down.  I think there's a lot of

1           R. Pallone - by Mr. Schneider

2      inconsistencies in what she says there in your

3      written Complaint that I read in your office

4      that you showed me.  It doesn't add up.  So I'm

5      a skeptic as a citizen.

6      BY MR. SCHNEIDER:

7           Q.    So just so we can sort of clarify

8      and use your knowledge of this building or the

9      building on the same lot that we're on today,

10     the entrance that is across from these

11     footbridges, what all is that used for, that

12     you know of?

13          A.    This entrance right here

14     (indicating)?

15          Q.    Yes.

16          A.    In the morning, students go in there

17     and they enter there for athletic events, the

18     pool, things of that nature.  In the morning

19     when the kids and students arrive.  Keeping in

20     mind, that we start school here at 7 a.m., and

21     probably for greater than better than half of

22     our school year, it's dark when our kids come

23     to school.  I don't want to underestimate

24     darkness for seeing this monument.

25          Q.    Would you agree with me that the Ten

# EXHIBIT N



PENGAD 800-631-6989   KM   **EXHIBIT**   4-14-14   P11   R. Pallone

# EXHIBIT O

My Membership    Login     Search this site

ABOUT FFRF    LEGAL    PUBLICATIONS    NEWS    FOR THE MEDIA    OUTREACH & EVENTS    GET INVOLVED    DONATE    SHOP

Home › Frequently Asked Questions › What is the Foundation's purpose?

# About the Foundation FAQ

## What is the Foundation's purpose?

The purposes of the Freedom From Religion Foundation, Inc., as stated in its bylaws, are to promote the constitutional principle of separation of state and church, and to educate the public on matters relating to nontheism.

Incorporated in 1978 in Wisconsin, the Foundation is a national membership association of approximately 20,000 freethinkers: atheists, agnostics and skeptics of any pedigree. The Foundation is a non-profit, tax-exempt, educational organization under Internal Revenue Code 501(c)(3). All dues and contributions are deductible for income tax purposes.

LEGAL DISCLAIMER

The information and materials on this website are intended for informational purposes only and are not intended to be treated as legal advice.

The information is general in nature, pertains to laws and policy which may become quickly dated, and may not apply to particular factual or legal circumstances.

The Freedom From Religion Foundation assumes no responsibility for errors or omissions on this website. The Foundation shall not be liable for any consequential, incidental, special, direct or indirect damages, including lost revenues, that might conceivably result from use of this site.

Report a Church/State Violation »

**FAQ CATEGORIES**

About the Foundation FAQ

State/Church FAQ

Freethought FAQ

RSS & Podcasting FAQ



FFRF is a non-profit, educational organization. All dues and donations are deductible for income-tax purposes.



FFRF has received a 4 star rating from Charity Navigator

FFRF privacy statement

FFRF is a member of Atheist Alliance International.



FFRF ON THE WEB

**Find** us on Facebook

**Follow** us on Twitter

**Subscribe** to us on Youtube

© **Freedom From Religion Foundation**
PO Box 750 · Madison, WI 53701 · contact us · email us

EXHIBIT P

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FREEDOM FROM RELIGION
FOUNDATION, INC., and DOE 1 by DOE
1's next friend and parent, MARIE SCHAUB,
who also sues on her own behalf,        Case 2:12-cv-01319-TFM

       Plaintiffs,

v.

NEW KENSINGTON-ARNOLD SCHOOL
DISTRICT

       Defendant.

_____

**DECLARATION OF REBECCA S. MARKERT IN SUPPORT**

**OF SUMMARY JUDGMENT**

Rebecca S. Markert states as follows:

1.     I am a Senior Staff Attorney at the Freedom From Religion Foundation. As such, I receive and review incoming complaints of a legal nature.

2.     On February 19, 2012, the Freedom From Religion Foundation received a report about the Ten Commandments monument in front of Valley High School from a student who was visiting the school and attended a school outside the New Kensington-Arnold School District.

3.     Prior to the filing of this lawsuit, I viewed posts on the webpage of a Facebook group called, "KEEP THE TEN COMMANDMENTS AT VALLEY HIGH SCHOOL."

4.       I observed that New Kensington-Arnold School Board President Robert Pallone posted a comment on the "KEEP THE TEN COMMANDMENTS AT VALLEY HIGH SCHOOL" page. Exhibit 1 is a true and correct copy of the comment I observed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 12th day of December, 2014, in Madison, Wisconsin.

Rebecca S. Markert

2



To the community of the NKASD – I am writing this to all of you that are concerned about the Ten Commandments Monument at the high school.

Clearly, we are under attack from an outside group from the state of Wisconsin – Our community, the administration, the board and our staff are outraged by the request to remove a monument that has been part of our district and community for decades. We WILL NOT remove this monument without a fight !!!!! We will litigate this issue at the highest level (US Supreme Court) if necessary. All of us in the district appreciate the overwhelming support from the community and as the current President of the board I want to assure all of you that we won't remove this monument without a battle. We are one of the most diverse school populations and communities in the Commonwealth, and we are extremely sensitive and accepting to everyone in the community. The claims of this organization are ridiculous and a complete travesty when you consider all the facts surrounding this situation.

This entire situation is ludicrous and a frivolous lawsuit and request by a radical group. Let's all attempt to remain professional and mannerly as we show our support on both sides of this emotionally charged issue. Please do not allow your emotions to denigrate your support by lowering our arguments to obscenities and radical responses. Please be assured that we will fight this and litigate this in a professional manner and continue to challenge until we get a decision that is acceptable to all of us!!! We will use our current legal team and the support of outside legal scholars and organizations that have contacted the district and offered free services.

Thank you again for your support and let's do all we can to control our emotions and channel our efforts into a positive and legal defense. Feel free to contact me personally at anytime if you want to discuss this in greater detail

Sincerely,                                          EXHIBIT 1
Robert M. Pallone

EXHIBIT Q

FREEDOM FROM RELIGION *foundation*

P.O. BOX 750 · MADISON WI 53701 · (608) 256-8900 · WWW.FFRF.ORG

March 20, 2012

**SENT VIA U.S. MAIL & FAX**
**724-994-1213**

Mr. George Batterson, Ed. D.
Superintendent
New Kensington-Arnold School District
701 Stevenson Boulevard
New Kensington, PA 15068



COPY

Re:     Unconstitutional Ten Commandments Monument Must Be Removed

Dear Dr. Batterson:

I am writing on behalf of the Freedom From Religion Foundation (FFRF) to urge you to immediately remove the Ten Commandments monument in front of Valley High School. This monument was brought to our attention by a local student who witnessed the monument when visiting Valley High School. FFRF is a national nonprofit organization with 17,500 members across the country, including nearly 600 members in Pennsylvania. Our purpose is to protect the constitutional principle of separation between state and church.

It is our information and understanding that a large granite monument of the Ten Commandments is prominently displayed at Valley High School. It is our further understanding that this monument sits between two footpath bridges that lead from the parking lot over a small stream to the main entrance of the school. Because of the numbering and missing commandment against "graven images," the monument contains a historically Roman Catholic version of the Ten Commandments. The monument reads:

## *the Ten Commandments*
### *I AM the LORD thy God.*

I.      *Thou shalt have no other gods before me.*
II.     *Though shalt not take the Name of the Lord thy God in vain.*
III.    *Remember the Sabbath day, to keep it holy.*
IV.     *Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.*
V.      *Thou shalt not kill.*
VI.     *Thou shalt not commit adultery.*
VII.    *Thou shalt not steal.*
VIII.   *Thou shalt not bear false witness against thy neighbor.*
IX.     *Thou shalt not covet thy neighbor's house.*
X.      *Thou shalt not covet thy neighbor's wife, his manservant, nor is maidservant, nor his cattle, nor anything that is thy neighbor's.*

The bottom of the monument contains a Star of David and a Chi-Rho inscription, which symbolizes Christ. Please see the enclosed photograph.

The permanent display of the Ten Commandments in front of a New Kensington-Arnold school violates the Establishment Clause of the First Amendment. Courts have continually held that public schools may not display religious messages or iconography. *See, generally, Stone v. Graham*, 449 U.S. 39 (1980)(ruling that the Ten Commandments may not be displayed on school walls); *Washegesic v. Bloomingdale Public Schools*, 813 F. Supp. 559 (W.D. Mich. 1993), affirmed, 33 F. 3d 679 (6th Cir. 1994)(ruling that a picture of Jesus may not be displayed in a public school). New Kensington-Arnold School District may not display Christian or other religious messages on school grounds.

The Supreme Court has found that posting the Ten Commandments in schools violates the Establishment Clause. *Stone v. Graham*, 449 U.S. 39 (1980). In that case, the Supreme Court definitively ruled:

> The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature…The Commandments do not confine themselves to arguably secular matters…rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.

449 U.S. 39, 41 (1980). Clearly, if a mere posting of a Ten Commandments poster is unconstitutional, a permanent monument prominently displayed in front of the school is unconstitutional.

As the Court ruled in *Stone v. Graham,* which involved donated posters, it is immaterial that this monument was donated. The financier is not relevant to the constitutionality of the monument. "Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land." *Pleasant Grove City, Utah v. Summum*, 129 S.Ct. 1125, 1139 (2009).

The religious message of the Ten Commandments is incontrovertible. As the Supreme Court said in *McCreary:*

> They proclaim the existence of a monotheistic god (no other gods). They regulate details of religious obligation (no graven images, no Sabbath breaking, no vain oath swearing). And they unmistakably rest even the universally accepted prohibitions (as against murder, theft, and the like) on the sanction of the divinity proclaimed at the beginning of the text.

*Id.* at 868. The Court went on to say:

> The point is simply that the original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction. When the government initiates an effort to place this statement alone in public view, a religious object is unmistakable.

*Id* at 869.

2

Although the Supreme Court allowed a long-standing Ten Commandments monument on government property in one unique context, the Court made clear that such displays in public schools are unconstitutional. The Court distinguished that case from the school context. Justice Breyer said, "This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state." *Van Orden v. Perry*, 545 U.S. 677, 703 (U.S. 2005) (concurring) (citations omitted). The Court said that *Stone v. Graham* "stands as an example of the fact that we have 'been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.'" *Van Orden v. Perry*, 545 U.S. 677, 691(citing *Edwards v. Aguillard*, 482 U.S. 578, 583-584, 96 L. Ed. 2d 510, 107 S. Ct. 2573 (1987)).

In addition to the unconstitutional purpose, prominent placement of the Ten Commandments monument at the school constitutes an unconstitutional endorsement of religion, in this case, the religious edicts of Catholicism. Any student will view a permanent 6-foot tall monument in front of the school entrance as being stamped with the district's approval. This "[s]chool sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community and accompanying message to adherents that they are insiders, favored members of the political community.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2001). New Kensington-Arnold School Districts' promotion of Christianity over other religions and religion over non-religion impermissibly turns any non-Christian or non-believing student, parent, or staff member into an outsider. The monument is especially troubling because it even conflicts with a protestant rendition of the Decalogue.

It is unfortunate that some educators feel it is their place to instruct other people's children on religious edicts. FFRF is committed to defending parental and student constitutional rights. I am co-counsel in an ongoing lawsuit on this same issue. *See Doe 1 v. School Board of Giles County*, No. 7:11-cv-00435-MFU (W.D. Va. Filed Sept. 13, 2011). That dispute has been disruptive to the school environment and could have been avoided.

This is a particularly egregious violation so please inform us at your earliest convenience in writing of your plan to rectify this matter and the date at which you plan to remove this unconstitutional monument. We look forward to an immediate reply.

Sincerely,

Patrick C. Elliott
Staff Attorney

PCE:scl

Cc: Jon Banko, Principal, Valley High School

Enclosure

3

# EXHIBIT R

**From:** George Batterson <gbatterson@nkasd.com>
**Sent:** Saturday, March 24, 2012 12:24 PM
**To:** joshua maddox
**Subject:** Re: Ten Commandments

Joshua,

Thank you for your great e-mail. I like the way you said you always said a little prayer when you passed the Ten Commandments. I do exactly the same thing every time I walk buy.

You have a great class. If we need you in the future I will be sure to contact you. We have good attorneys. We believe we will be successful in the end and be able to keep the Ten Commandments on our high school lawn.

May God bless you Joshua. I am sure you will be a great success in life.

Dr. B.

On Mar 24, 2012, at 11:50 AM, joshua maddox wrote:

> Dear Doctor Batterson,
>
> I am Joshua Maddox Valley High School Graduate and Alumni Class of 2009, I have recently over heard from some of my classmates and former students about the controversy about the Ten Commandments Statue in front of our High school, I was speaking to Ms Whitlinger about this at work yesterday and it had me very upset at the fact that this group would target our school, This has never had and issue before until now, that i recall, But for the 4 years i attended Valley, i would always walk past it and say a little prayer and it always gave me a piece of mind,  I recently saw on WPXI and the interview you had with them, and i am proud to stand by the NKASD with this issue. I would like to thank you for your hard work and dedication through this hard trial and if you need anything from the Class Alumni of 2009, we are full standing behind you with our support!
>
> Thank you once again
> J.Maddox

NewKen-Arnold 00354

EXHIBIT S

TRIB TOTAL MEDIA

Just Pay Half!   Sign In or Sign Up

Subscribe    Place Ad    Buy Trib Photos    Jobs    Homes    Autos    Classifieds    SportsTalk    Contests

# TRIB LIVE | News

Search

*Western Pennsylvania's top news and sports source*

Home   **News**   Investigative   Neighborhoods   State   Politics   U.S./World   Sports   Opinion/The Review   Business   A&E   Lifestyles   Obituaries

Columnists   Allegheny   Armstrong   Beaver   Butler   Fayette   Indiana   Somerset   Washington   Westmoreland   Marcellus Shale   Education
Pennsylvania   Blog   Contact Us

Two Corporate Circle Professional Office Suites

SUBSCRIBE TODAY!
TRIB TOTAL MEDIA Get it right, Now.

Larger text  Smaller text

# Wisconsin atheist group targets Valley's display of Ten Commandments

**By Michael Aubele**

Published: Friday, March 23, 2012,

A Ten Commandments monument in front of Valley High School is an "egregious" violation of the separation between church and state, according to a Wisconsin-based atheist group seeking to have the school district remove it.

The Freedom From Religion Foundation sent district officials a letter this week asking them to remove the stone monument, which the New Kensington Fraternal Order of Eagles donated to the district decades ago. The nearly 6-foot-high monument sits prominently in front of the entrance to the school's gymnasium.

Annie Laurie Gaylor, the foundation's co-founder, said the monument's location definitely violates the Constitution. She said the foundation would file a lawsuit to force the district's hand if necessary.

"This is not something we can let stay," she said. "This isn't a minor violation. The law is totally clear. There should be no need to sue."

Superintendent George Batterson said the district has no immediate plans to remove the monument and suspected the issue would end up in court.

"We're not happy with them asking us to take down the Ten Commandments," Batterson said.

In its letter, the foundation accuses the district of violating the First Amendment's establishment clause, which deals with separation of church and state. It cites court decisions, notably the 1980 U.S. Supreme Court ruling in Stone v. Graham, which found that public schools can't display religious messages or iconography.

"From my view, this is an unsurprising letter given the law," said Vic Walczak, legal director of the Pennsylvania American Civil Liberties Union. "The Supreme Court decided on this more than 30 years ago."

Walczak said instances of public schools disregarding the court's decision in the Pittsburgh region are rare.

"I don't really recall a previous Ten Commandments complaint," he said. "There might have been one or two in the 20 years I've been here. The law is just that clear."

Batterson said he received the foundation's letter on Wednesday and presented it to the school board during a private session before Thursday's board meeting. The letter was not discussed during the public meeting.

Board Vice President Jason Fularz said the board asked district Solicitor Tony Vigilante to review the letter and make a recommendation on how to proceed.

Fularz said he otherwise had no comment on the foundation's request, other than to express surprise that it was an issue. He said he is unaware of any complaints lodged about the monument during his 13 years on the school board.

Board President Bob Pallone didn't return a call for comment and was absent from last night's meeting.

**About The Tribune-Review**

The Tribune-Review can be reached via e-mail or at 412-321-6460.

Contact Us | Video | RSS | Mobile


STEEL CITY Auto  Click Here!


Gear Up for Baseball!
FANATICS  Click Here


Try the eTRIB - digital edition
Just 99¢ for 4 weeks!!
CLICK HERE to try it NOW!
eTRIB


Looking for Something?
Car?
classifieds.TRIBLIVE.com

**Daily Photo Galleries**


Tuesday - August 27, 2013

**VIDEO**          More Videos


Play Video
Steelers RB's For Final Pre Season Gam...
00:00          02:27

Wisconsin atheist group targets Valley's display of Ten Commandments | TribLIVE                                    8/28/13 1:38 PM

School officials weren't certain when the monument was erected, but believe it predates a 1971 addition to the high school. They noted the monument also includes the Star of David, a traditionally Jewish symbol.

The Freedom From Religion Foundation's letter states the Ten Commandments inscribed on the monument are a historically Roman Catholic version that not only could alienate non-Christians, but also Christians who are not Catholic.

"I feel it should stay," New Kensington Eagles Secretary Marc Hoak said.

"This is our creed and our motto," Hoak added. "I hope (the district) doesn't consider this group's request. It seems like they want to take away all of our social values in this country."

According to the foundation's letter, "This monument was brought to our attention by a local student who witnessed the monument while visiting Valley High School."

Gaylor refused to identify the student.

According to its website, the foundation is fighting a legal battle against the school board in Giles County, Va., to remove a Ten Commandments display from Narrows High School.

The foundation was in the news in Western Pennsylvania in December when it forced Ellwood City to move its Christmas Nativity scene from borough property under the threat of a lawsuit.

Gaylor said the foundation also plans to file a federal lawsuit against the Pennsylvania General Assembly's resolution declaring 2012 as the "Year of the Bible." She said the suit should be filed no later than Monday.

Walczak said the ACLU tries to "change the facts" to help people understand why it supports efforts to protect constitutional rights.

"If they placed a Moses tablet or something from the Koran in front of the school, would the parents react differently?" he said. "They wouldn't like that, and they shouldn't like this."

Walczak said the ACLU isn't directly involved with the foundation's request. Gaylor said the organizations "often work in concert" because they share similar concerns.

Bruce Antkowiak, a law professor at Saint Vincent College, said arguments could be made for both sides if the case plays out in court.

"The court would have to consider whether or not the display represents the intent on the part of a public body the school district to promote religion."

Antkowiak referenced a court case in Texas in which the constitutionality of having the Ten Commandments posted at the state house in Austin was challenged. He said the Supreme Court determined the display's significance was historical and not intended to advance a religious cause so it could remain.

"If this would go to litigation if they can't work something out I'm sure that's what the school board is going to be arguing that this is a matter of almost a historical anomaly and wasn't erected for the purpose of promoting any religious group or value."

He said the fact that the monument doesn't sit near a display of a secular nature could work against the district.

"To me, it would be very interesting to see how the court can resolve the issue, given the balance of the factors," Antkowiak said.

*Staff writer Liz Hayes contributed.*

Additional Information:

**Battling beliefs**
**1989:** The U.S. Supreme Court ruled that a crèche, or nativity scene, on the grand staircase inside the Allegheny County Courthouse violated the Constitution's establishment clause because its primary message was religious. However, the court said an 18-foot Hanukkah menorah outside the City-County Building, Downtown, was permitted because officials displayed it beside a 45-foot Christmas tree and a banner saluting liberty.

**2004** : A federal appeals court rules that a plaque of the Ten Commandments on an outside wall of the Allegheny County Courthouse does not violate the separation of church and state because the 1918 plaque was part of history and that its location at the Fifth Avenue entrance is not prominent enough to send a message of religious endorsement.

**2011:** Ellwood City Council votes to move a holiday display containing a crèche off public property to avert a lawsuit by the Freedom From Religion Foundation. The group threatened to sue because officials refused to include its banner next to the display declaring that religion is 'myth and superstition.'

Additional Information:

**New Kensington rally**
A New Kensington man said he is organizing a rally for Saturday to keep the Ten Commandments memorial at Valley High School.

Mike Hresko, 58, who said he has a daughter attending the high school, said he's holding the rally to give residents 'a chance to speak up' about their desire to keep the monument in place.

'I am really upset,' Hresko, 58, said. 'We have rights, too. Having these people from (Wisconsin) tell us to remove a granite monument that you can't even see from the parking lot has surely riled up.'

He said the United States was founded on Christian values and principles and that needs to be continued.

'Little by little they're starting to take those things away,' Hresko said. 'Eventually there will be nothing left to show.'

---

**Westmoreland Photo Galleries**



St. Vincent students roll up their sleeves to help neighbors


Steelers RB's For Final Pre ...
Steelers RB's For Final Pre Season Game Thursday


Clint Hurdle on track with Mets
Pittsburgh Pirates talk with Guy Junker and Ken Laird every weekday starting at 10am at Sportstalk.Triblive.com

Huntington weighs in
Pirates GM Neal Huntington talks with reporters about the team

**This Week's Deals**                                        1 of 8




**VIEW AARON'S AD**          **VIEW ALDI AD**


**VIEW ACE HARDWARE AD**     **VIEW BABIES R US AD**





• **Norquist: Obamacare Delay Better Than Defunding**

**FROM AROUND THE WEB**                              ADVERTISEMENT


Pastor says he turned his father's


Who flaunts the best 6-Packs of the


Avoid doing these 3 exercises that make

Have a $500k portfolio? Ken

Wisconsin atheist group targets Valley's display of Ten Commandments : PittsLIVE

8/28/13 1:38 PM

$40,000 retirement into $396,000 by flipping this 'Obama blunder'

summer?

you fatter every day

Fisher, a 27-year Forbes columnist, has a retirement guide for you!

- **Russia: US Strike Will Have 'Catastrophic Consequences'**
- **Christie Under Fire for Sandy Storm Ads**
- **Video: Discovery Lowers Blood Pressure, Heart Attack Risks**
- **Pope Francis Stuns Rape Victim With Call**
- **Doctors President Warns About Obamacare**
- **'Butler' Ticket Sales Plummet by 30 Percent**

What's This?

 Add a comment...

Comment

Facebook social plugin

*Show commenting policy*

| Most-Read Westmoreland |
|---|

1. Latrobe hospital hosts nuptials as groom keeps mom close to his heart
2. Alumni sought for combined Ramsay Bobcat Reunion
3. Con artist jailed in Spadaro's demise balks at paying bill
4. Rainy summer not so cool for Western Pennsylvania pools
5. Bank's claim adds twist  to Jeannette settlement
6. St. Vincent students roll up their sleeves to help neighbors
7. Ligonier Township zoning board rules in nursing home's favor
8. Questions accrue as YMCA plans Ligonier facility
9. Jeannette man jailed in assault
10. North Huntingdon man dies in accident
11. San Diego native committed to kindness makes trek across country

 Subscribe today! Click here for our subscription offers.

**NEWSPAPERS**
Obituaries
TribLIVE Mobile News
TribLIVE Mobile Sports
Pittsburgh Tribune-Review
eTRIB Digital Replica
Tribune-Review
Blairsville Dispatch
Daily Courier
Valley Independent
Valley News Dispatch
Leader Times
The Daily News
Community Newspapers

**MARKETPLACE**
Autos
Classifieds
Find Pittsburgh Jobs
Homes
Pittsburgh Pennysaver
Store Circulars
Photo Store

**FEATURES**
Search
Today's Stories
RSS Feeds
Site Map
Contests
Events Calendar
Movie Showtimes
Bloggers
Video

**YOUR TOWN**
YourCranberry.com
YourFoxChapel.com
YourMonroeville.com
YourNorthHills.com
YourNorwin.com
YourPennHills.com
YourSewickley.com
YourSouthHills.com
YourTwinBoros.com

**HELP & SERVICES**
Contact Us
Feedback
Subscriber Services
Subscribe to our publications
Commercial Printing
Place a classified ad
Print advertising
Pittsburgh Newspaper Group

TRIB | TOTAL MEDIA

Images and text copyright © 2013 — Trib Total Media, Inc.
Reproduction or reuse prohibited without written consent.
Advertising Information | Terms of Service

# EXHIBIT T

**From:** George Batterson <gbatterson@nkasd.com>
**Sent:** Friday, March 23, 2012 7:04 PM
**To:** Carol Macklin
**Subject:** Re: Ten Commandments - Carol Macklin

Carol,

Thank you for this great e-mail.

You are a great person and it is a pleasure to work with you.

If we pray about this issue God will help our children to win out over the atheist organization that wants to impose their will on us.

Have a great weekend. I will see you Monday.

George

On Mar 23, 2012, at 6:48 PM, Carol Macklin wrote:

> Dr. Batterson,
>
> I just saw the WPXI film clip taken in your office this afternoon. I am so proud! The monument is a part of Valley High School's history and tradition and I was very happy to hear you
>
> say that it's not going anywhere. I know this year is your last at NK-ASD, so from now on, you'll be remembered as the man who refused to take down that monument!
>
> Thank you!!
>
> Sincerely,
>
> Carol Macklin

NewKen-Arnold 00348

1

# EXHIBIT U

**From:** Shaun Sperl [ssperl@nkasd.com]
**Sent:** Friday, March 23, 2012 2:26 PM
**To:** George Batterson
**Subject:** Re: Channel 11 Interview

George. I'm interested in this given my strong Christian beliefs. Would you mind emailing the script, if it's not an inconvenience. Shaun

Sent from my iPhone
Shaun Sperl
724-859-3197
ssperl@nkasd.com

On Mar 23, 2012, at 1:58 PM, George Batterson <gbatterson@nkasd.com> wrote:

> Hi Everyone,
>
> As you know Channel 2 sent a news team this morning.
>
> Channel 11 interviewed me this afternoon. They also went to the high school to take pictures of the Ten Commandments. I used the script I prepared after talking to Ray and Tony.
>
> George

NewKen-Arnold 01092

# EXHIBIT V

**B**



The board of education
conference room



An oversized classroom — the
physics class and laboratory



A typing class — part of the
commercial department

NewKen-Arnold 00167

EXHIBIT W



**Julz Ann    KEEP THE TEN COMMANDMENTS AT VALLEY HIGH SCHOOL**
I have the solution! If the atheists group would like to erect a statue of the Theory of Evolution at their expense... we can display it beside the Ten commandments! I gladly support their right to display their beliefs it doesn't offend me, and that statue shouldn't offend them! First its a problem with the pledge in school, then the nativity scene, now a statue. Im not even sure where this idiocy will end!

3/24/2012 3:36:19 PM (UTC -04:00) Mobile

   9 likes: Barbara Cousins-Carnahan, Lynn Errico, Marilyn Harkins Claassen, Karen Sedlacek Gould, Joy Pittman Smith, MaryLou Cowen, Kenya Smith, Susan Coury-Kline, Debbie Perry Rayburn

3 comments.

**Nadine Sokol Ellena** It ends when "we" the ppl stop them from eliminating things because they say so...IF they want to erect their statue of the Theory of Evolution let them do it on their own WI soils...not ours...I wont be offended either...I just think that as long as the activist groups continue to get their way and eliminate things that have no relevance "where will it stop?" or will they grow in their momentum ...nip it in the bum ...
3/24/2012 3:40:15 PM (UTC -04:00)

**Kenya Smith** Yeah...let em have their statue...and their belief. God fearing people aren't telling them what to do. I agree w/^NADINE nip it in the bud...how bout this? Ignore them. Last I checked there was "supposed" to be a separation between church and state...glad to know that I now live in the state of New Kensington. I think it's ridiculous. When I saw that on the news it really upset me.
3/24/2012 3:47:46 PM (UTC -04:00)

**Tim Dudenhoefer** It won't end, unless we stand up to them. In massachusets they were able to get schools to ban green and red at Christmas. No lie!
3/25/2012 9:58:57 AM (UTC -04:00)

**NewKen-Arnold 01113**

**Tom Wynkoop     KEEP THE TEN COMMANDMENTS AT VALLEY HIGH SCHOOL**
When I was walking through New Your past the Muslim temples, I was offended. Tell th to rip it down

3/24/2012 3:50:37 AM (UTC -04:00) Mobile

7 likes: Rose Potts, Susan Coury-Kline, Robert Pallone, Debbie Perry Rayburn, Lois Hydock, Carol Larussa Perry, Joy Pittman Smith

0 comments.

**NewKen-Arnold 01114**

**John Zavadak      KEEP THE TEN COMMANDMENTS AT VALLEY HIGH SCHOOL**
Everyone is entitled to their opinion- this Wisconsin group and the ACLU have no right telling us what we can and can't have on our school property. I think the school district should ignore this group and we will let a judge decide. If the judge thinks we should remove the monument the next time he is up for retention we will vote his ass out.

3/23/2012 10:22:32 PM (UTC -04:00)

8 likes: Marilyn Harkins Claassen, Joni Boggs Marcy, Carol Brown, Dena Kuhn, Mark Simoni, Susan Coury-Kline, Lambra Nemeth and 1 other people like this.

0 comments.

NewKen-Arnold 01115

# EXHIBIT X

**George S. Zavadak**     **KEEP THE TEN COMMANDMENTS AT VALLEY HIGH SCHOOL**
http://www.pittsburghlive.com/x/valleynewsdispatch/s_788566.html

> **New Kensington 10 Commandments rally postponed**
> www.pittsburghlive.com
>
> Organizer Mike Hresko said the rally will be held at some point but school district officials requested that he move it to a future date.
>
> 3/27/2012 7:11:30 PM (UTC -04:00)

3 likes: Barbara Cousins-Carnahan, Monica Storrs, Nadine Sokol Ellena

0 comments.

NewKen-Arnold 01111